UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
_____

|  |  |  |
|---|---|---|
| MARIANNE ANTCZAK, on behalf of herself and other similarly situated persons | : : : | |
| | : | COMPLAINT- CLASS ACTION |
| Plaintiff, | : | |
| | : | NO. |
| vs. | : : | |
| TD AMERITRADE CLEARING, INC., TD AMERITRADE, INC., TD AMERITRADE INVESTMENT MANAGEMENT, LLC, ULTIMATE FINANCIAL INVESTMENTS, LLC and BRIDGET A. FERNANDEZ, individually and professionally | : : : : : : : : | |
| Defendants. | : | |

# COMPLAINT- CLASS ACTION

## INTRODUCTION

Plaintiff brings this action on behalf of herself and all others similarly situated to secure redress from Defendants who enabled, facilitated and concealed registered investment advisors ("RIAs") who openly and notoriously pursued wildly unsuitable trading strategies using wildly unsuitable investments causing great loss in funds and securities held in TD Ameritrade brokerage accounts. The RIA/registered principal ("RP") who essentially gambled away most of Plaintiff's retirement funds was Defendant Bridget Fernandez who owned an investment advisor/introducing broker/dealer named Ultimate Financial Investments, LLC.

Defendant Ultimate Financial Investments, LLC ("UFI"), *inter alia*, heavily over-concentrated Plaintiff Marianne Antczak's money in daily leveraged exchange-traded funds[1] ("ETFs") and, to the great detriment of Plaintiff, held onto these positions for weeks, months and years.  UFI employed this same wildly unsuitable investment strategy in most, if not all, of its customers' TD Ameritrade brokerage accounts.    After UFI ceased to function and TD Ameritrade knew RIA/RP Fernandez was no longer licensed, TD Ameritrade concealed Ms. Fernandez in her individual capacity from regulators as she openly and notoriously continued to pursue the same wildly unsuitable trading strategy using these wildly unsuitable investments in the accounts of many former customers of UFI once they moved over to TD Ameritrade Retail by using their personal log-in information to trade in their accounts.  There is practically nothing left in Plaintiff's TD Ameritrade brokerage accounts.

This Complaint is based upon the personal knowledge of Plaintiff and upon information and belief as to other matters, and avers as follows:

## PARTIES

1.      Plaintiff Marianne Antczak ("Plaintiff" or "Mrs. Antczak") is a senior citizen residing in Cinnaminson, Burlington County, New Jersey.

---

[1] ETFs are exchange-traded investment products registered as open-end investment companies or unit investment trusts under the Investment Company Act of 1940, as amended.  ETFs have become so popular in the United States that they presently account for about 30% of all trading (by dollar value).  Unlike mutual funds, ETF shares trade throughout the trading day on national securities exchanges and at market prices that do not necessarily mirror the net asset value ("NAV") of the underlying portfolio of assets in which the fund is invested.  Additionally, unlike mutual funds, ETF issuers do not sell individual ETF shares directly to, or redeem individual ETF shares directly from, retail investors or other market participants.  Instead, only certain qualifying entities designated as "Authorized Participants" (i.e., clearing firms like Defendant TD Ameritrade Clearing, Inc.) can create and redeem shares directly with an ETF issuer.

2.      Defendant TD Ameritrade Clearing, Inc. ("TD Clearing") is incorporated in Delaware with its principal place of business located at 200 South 108th Avenue, Omaha, Nebraska 68154. TD Clearing is regularly engaged in the business of clearing trades as a broker/dealer via U.S. mail, telephone, and the internet.

3.      Defendant TD Ameritrade Investment Management, LLC ("TD Advisory") is incorporated in Delaware; it is the investment advisor ("IA") in the family of TD Ameritrade companies.  TD Advisory has its principal place of business located at 200 South 108th Avenue, Omaha, Nebraska 68154 and is regularly engaged in the business of a licensed IA via U.S. mail, telephone, and the internet.

4.      Defendant TD Ameritrade, Inc. (Financial Industry Regulatory Authority, Inc. ("FINRA") Central Registration Depository ("CRD") # 7870) ("TD Ameritrade") is incorporated in Delaware with its principal place of business located at 200 South 108th Avenue, Omaha, Nebraska 68154.  TD Ameritrade is regularly engaged in the business of trading securities as a broker/dealer ("BD") via U.S. mail, telephone, and the internet.  One of TD Ameritrade, Inc.'s divisions is called "TD Ameritrade Institutional;" TD Ameritrade enters into contracts to provide services to IAs and introducing broker/dealers on its TD Ameritrade Institutional platform. Another division of TD Ameritrade, Inc. is called "TD Ameritrade Retail" ("TD Ameritrade Retail").

5.      Defendant Ultimate Financial Investments, LLC (CRD and IARD # 162585) ("UFI") was licensed by the Commonwealth of Pennsylvania's Department of Banking and Securities (the "Commonwealth of Pennsylvania") as an IA from on or about June 21, 2012 until sometime in 2014.  UFI also served as an introducing BD and was incorporated in Delaware from 2012 until May, 2016.  Now defunct, UFI was last located at 146 W. 4th Ave., Apt. 2, Conshohocken,

Montgomery County, Pennsylvania, 19428.  UFI was located in Fort Washington, Pennsylvania (Montgomery County) when it operated as an IA and introducing BD.  UFI regularly engaged in the business of serving as a broker/dealer and IA via U.S. mail, telephone, and the internet.

6.      In her professional capacity, Defendant Bridget A. Fernandez (FINRA CRD # 4171289) was the Chief Compliance Officer ("CCO") and Chief Executive Officer ("CEO")/Manager of UFI.  Ms. Fernandez was also the only RIA of UFI's IA business and the only registered principal ("RP") of its BD business during the entire existence of UFI.  Ms. Fernandez was named as a Defendant herein in her professional capacity for holding these positions and being responsible for UFI's compliance with the securities laws.

7.      Defendant Bridget A. Fernandez in her individual or personal capacity is an adult person who currently resides at 146 W. 4th Ave., Apt. 2, Conshohocken, Montgomery County, Pennsylvania, 19428.  Defendant Fernandez is named herein individually for the actions she took after UFI was no longer functional.


## VENUE AND JURISDICTION

8.      This Court has federal question jurisdiction.  Complete diversity also exists between the parties herein and the proposed Classes have hundreds if not thousands of members who are introducing BD and/or IA customers residing all over the country who have collectively incurred more than $5 million in losses.

9.      Venue and personal jurisdiction in this District are proper because:

        a.      At all times during its corporate existence, Defendant UFI was located in Montgomery County, Pennsylvania as was its CEO, sole RIA and sole RP.  Communications with Plaintiff emanated from this District from Defendants UFI and Bridget Fernandez during

the period of time RIA/RP Fernandez was operating in her professional capacity as well as during the period of time she was operating in her individual capacity regarding the unlawful conduct described herein.   Defendant Bridget Fernandez currently resides in Montgomery County, Pennsylvania; and

        b.     The TD Ameritrade Defendants routinely do business throughout the United States including this District via U.S. mail, telephone, and the internet.  TD Ameritrade and TD Clearing provided services to UFI in this District during its existence.

## FACTS

10.    Bridget A. Fernandez entered the financial services industry as a RIA sometime around the year 2000.  Defendant Fernandez spent almost 7 years at UBS Financial Services Inc. ("UBS") before she departed there on or about February 23, 2012.  RIA Fernandez foresaw her leaving UBS because she incorporated UFI one month before her termination date at UBS.

11.    Defendant Fernandez managed to have her own introducing BD/IA, Ultimate Financial Investments, LLC, up and running less than four months after leaving UBS.  UFI was accepted onto the TD Ameritrade Institutional platform and cleared its trades via TD Clearing.

12.    The 2016 Form 10-K issued for TD Ameritrade Holding Corporation and its subsidiaries explains on page 3 that:

> Operations
>
> We are a leading provider of securities brokerage services and related technology-based financial services to retail investors, traders and independent registered investment advisors ('RIAs'). We provide our services predominantly through the Internet, a national branch network and relationships with RIAs. We believe that our services appeal to a broad market of independent, value-conscious retail investors, traders and investment advisors. We use our platform to offer brokerage services to retail investors and investment advisors under a simple, low cost commission structure.

           *          *          *

Since initiating online trading, we have substantially increased our number of brokerage accounts, number of RIA relationships, average daily trading volume and total assets in client accounts.

           *          *          *

Our long-term growth strategy is to increase our market share of total assets in client accounts, while maintaining a leadership position in client trading, by providing superior offerings to long-term investors, RIAs and active traders.

13. According to the 2014 Form 10-K issued for TD Ameritrade Holding Corporation, TD Ameritrade Institutional was providing brokerage and custody services to about 4,500 independent RIAs and their clients. TD Ameritrade Holding Corporation's 2016 Form 10-K states this number has risen to 5,000 independent RIAs.

14. Once UFI got approved by regulators, Defendant Fernandez quickly circled back to her UBS customers asking them to switch to UFI. Plaintiff moved her UBS accounts to UFI in the summer of 2012. Mrs. Antczak entered into an Ultimate Financial Investments, LLC Investment Advisory Contract dated July 2, 2012 (the "UFI Advisory Contract"). The UFI Advisory Contract gave RIA Fernandez complete discretion to trade in Mrs. Antczak's UFI accounts.

15. Attached to the UFI Advisory Contract as Exhibit I was a Written Investment Policy Statement dated June 19, 2012 (the "Investment Policy Statement"). The Investment Policy Statement was to serve; "as a 'document of understanding' between the Adviser and the Client which covered the Client's current financial situation, investment goals and objectives, and describe[d] proposed investment strategies and 'need[ed] to be updated periodically in order to remain relevant.'" *See* Investment Policy Statement, p. 6. The Investment Policy Statement was signed by Mrs. Antczak and Bridget Fernandez in her capacity as CCO of UFI and then again as the advisor (i.e., RIA) who had a fiduciary duty to Mrs. Antczak. *See id*. at p. 9.

16.     The Investment Policy Statement in Mrs. Antczak's UFI Advisory Contract is lacking the information that should appear regarding her net worth, age, current income and investment objectives.  In box the advisor is supposed to check on the UFI Advisory Contract if they have obtained the Client's financial records, RIA/RP Fernandez wrote "N/A." *See* Investment Policy Statement, p. 7.  The Investment Policy Statement also poses questions seeking to identify the client's tolerance for risk- the questions in that section were also left unanswered. *See id.* at p. 8.

17.     In the next section of the Investment Policy Statement the Adviser was supposed to;

> supply a detailed description of the investment strategy and business model that they will recommend to the Client.  Included in this section should be details of any account or portfolio **rebalancing** strategies or procedures and the time frames for rebalancing. While each client's proposed investment strategies or allocation models will of course be customized there should be various similarities in the adviser's business model to allow that [sic] majority of this information to be created as a 'template' that requires only minor modifications for each client.

*See id.* at p. 9 (emphasis in original).  This section of Mrs. Antczak's UFI Advisory Contract was also left blank.

18.     The Investment Policy Statement notes "A **Custodian** (Broker-Dealer Firm) will be chosen that meets the needs of the Adviser and the Client and that meets the Advisers 'best execution' standards. The Custodian, not the Adviser, will maintain constructive custody of the Client's assets and provide various services and reporting to both the Client and the Adviser." *See id.* at p. 6 (emphasis in original).  Exhibit III of the Investment Policy Statement revealed the Custodian would be TD Ameritrade Institutional in Fort Worth, Texas. *See id.* at p. 11.  One of the purposes behind UFI entering into the UFI Advisory Contract was to send along a copy of the completed advisory contract to UFI's clearing BD firm.

19.     While the clearing agreement UFI entered into with TD Ameritrade Institutional and TD Clearing delegated the responsibility of performing know-your-customer ("KYC") duties to UFI,

TD Ameritrade Institutional and TD Clearing are also subject to regulation and enforcement actions by, among others, the Securities and Exchange Commission ("SEC") and FINRA and therefore perform KYC reviews of the customers of introducing BDs and IAs independently of the introducing BDs' and IAs' performance of their respective KYC duties.  As an introducing broker and IA, UFI was responsible for sending a copy of its KYC documentation for each customer to TD Ameritrade Institutional and/or TD Clearing promptly after an account was set up for a new customer (and later on if there were any significant changes to the information contained therein).

20.     Since the time it opened its doors, UFI did not possess the basic KYC information in writing as to Mrs. Antczak's, or any other customer of UFI's, financial background, personal situation, investment objectives and tolerance for risk.  TD Ameritrade Institutional and TD Clearing thus also lacked that information.  So when exactly did TD Ameritrade Institutional and/or TD Clearing realize UFI's Advisory Contracts did not contain completed Investment Policy Statements?  Ominously, it appears to have been not until shortly before UFI was terminated by TD Ameritrade and/or TD Clearing.

21.     Another red flag TD Ameritrade Institutional and/or TD Clearing ignored during the existence of UFI was that UFI never filed a Form ADV after filing its initial one.  All IAs are to file a Form ADV within 90 days of the end of their fiscal year.  According to www.adviserinfo.sec.gov, the last Form ADV UFI filed was on June 21, 2012 which happens to be the date UFI was granted a license by the Commonwealth of Pennsylvania.  Thus UFI was not performing the most basic regulatory requirements and TD Clearing knew or should have known it from near the outset of their relationship.

22.     According to BrokerCheck on FINRA's website, Bridget A. Fernandez had only one customer dispute that occurred when she was a RIA of UBS (the "Prior Complaint"). The filing date of the Prior Complaint (a FINRA arbitration claim) was June 25, 2013 (so it would have been reported to FINRA and appeared as a disclosure on BrokerCheck within a month or so of the filing date). The Prior Complaint alleged; "FA [Financial Adviser] Fernandez failed to follow instructions to reduce risk, preserve principal and avoid volatile stocks. Claimants also allege that FA Fernandez engaged in unauthorized trading." The Prior Complaint alleged damages were $975,562.27. Thus TD Ameritrade and TD Clearing knew or should have seen a summary of the allegations contained in the statement of claim (i.e., complaint) posted on BrokerCheck sometime around the beginning of August, 2013. However, TD Ameritrade and TD Clearing failed to meaningfully review anytime in 2013 the accounts of UFI customers to see if UFI's trading history mirrored in any way the allegations made in the Prior Complaint since RIA/RP Fernandez was the sole licensed person at UFI.

23.     Indeed, when did TD Ameritrade finally take a meaningful look at what RIA Fernandez was doing at UFI? Every day that has lapsed since TD Ameritrade knew or should have known about the compliance shortcomings and wildly unsuitable investment strategy UFI was employing (and later Ms. Fernandez in her individual capacity) and failed to inform a regulator was grave error for all involved costing Plaintiff personally to lose hundreds of thousands of dollars in her TD Ameritrade brokerage accounts. TD Ameritrade and/or TD Clearing summarily terminated its clearing agreement with UFI and immediately blocked UFI's and RIA/RP Fernandez's access to UFI customer accounts on TD Ameritrade Institutional's platform on or about April 17, 2014.

24.    On April 15, 2014, just 2 days before TD Ameritrade shut down UFI, TD Ameritrade

took a management fee of $1,009 from Mrs. Antczak's account ending in x235 on behalf of UFI

covering the time period of April 1, 2014 thru June 30, 2014.  TD Ameritrade had withdrawn

$792 on March 7, 2014 from the x235 account for services mostly already rendered by UFI

(assets under management ("AUM") wrap fees are normally paid three months in advance).  TD

Ameritrade held up withdrawing UFI's AUM wrap fee from its customers accounts and paying

UFI the money until March 7, 2014 (the AUM fee should have been withdrawn on or about

January 15, 2014) because TD Ameritrade Institutional and/or TD Clearing was trying to

negotiate UFI leaving the TD Ameritrade Institutional platform without any party calling a

regulator on another party herein.  TD Ameritrade Institutional/TD Clearing did not refund the

advisory fee TD Ameritrade deducted from Mrs. Antczak's account on April 15, 2014 on behalf

of UFI even though UFI, at best, earned only 17 days worth of that fee.

### TD Ameritrade and UFI Issue Conflicting Letters about the April 17th, 2014 Freeze Out

25.    TD Ameritrade Institutional, a division of TD Ameritrade, Inc., sent a letter to Plaintiff

dated April 17, 2014 for each of her accounts signed by Jeremy Steinle, Senior Specialist,

Institutional Risk Oversight and Control (the "April 17th Termination Letter").  The April 17th

Termination Letter stated;

> TD Ameritrade Institutional provides custody and execution services to independent
> registered investment advisors.  Our records indicate that you have granted trading
> authorization to Ultimate Financial Investments.  Please be advised that TD Ameritrade
> Institutional no longer has a working relationship with this firm.  As a result, TD
> Ameritrade will no longer honor instructions from Ultimate Financial Investments or its
> representatives on your account.

> We will provide 30 days from the date of this correspondence to allow you to transfer
> your account to another brokerage custodian.  If you do not wish to transfer your account
> to another brokerage custodian, to better serve your needs as a self-directed investor, your
> account will be transferred to TD Ameritrade Retail Division no sooner than 17-May-

2014. Because of the transition to a self-directed retail account, your account number will change and any cash management services or option approval you had on your advisor-managed account will cease.

*        *        *

**Please note that TD Ameritrade is acting solely as custodian for your account at this time. Accordingly, as of receipt of this notice you are responsible for making all investment decisions in your TD Ameritrade account.**

(emphasis in original).

26.     UFI's CEO and CCO, RIA/RP Fernandez, wrote a letter to the customers of Ultimate Financial Investments also dated April 17, 2014 (the "April 17th Counter Letter").  The April 17th Counter Letter read as follows:

Dear Client:

I am writing to let you know that TD Ameritrade Institutional will be sending you a letter soon to transfer your accounts to their retail arm TD Ameritrade.  TDAI informed me that their relationship with my firm Ultimate Financial Investments, LLC will be terminated 'without cause'.

Although TDAI has not given a particular reason for terminating my relationship with them as custodian, I can only speculate that it has to do with my not opening enough new accounts and increasing assets under management.  (In other words, I didn't make enough money for them.) TDAI has the 2nd highest average assets under management for RIAs (Registered Investment Advisors), just behind Schwab as custodian. My assets under management are below this average.

I could go to another custodian. However, TDAI has given me a limited timeframe to transfer accounts. A new custodian would result in a new 1099 for 2014. It is not something that I want to rush into lightly. As a result, I have decided not to move my business to a new custodian just yet. I will no longer take new clients. However, I will manage accounts for those clients that want me to remain as their portfolio manager. I can do so after your accounts are moved to the retail accounts with TD Ameritrade. If we stay with TD Ameritrade retail, my clients don't have to sign all new paperwork either. It should only require one signature requesting the accounts to be moved.

This past year was an anomaly in the stock market. I expected a pullback in the stock market with gold and silver to return to their old highs over time. However, I was wrong (or early). The S&P 500 had an excellent year while gold and silver underperformed with

a decrease in value from $1,675 to $1,204/oz. As a result, it has been a difficult year for me and for my clients invested in gold and silver instruments. Gold declined 28%, which was the largest annual decline since 1981. The 12 year bull-run in gold paused with this decline. However, as many of you know, most gold bull runs last up to 20yrs.

I continue to believe that gold and silver will reach all-time highs in the coming years. The global money printing experiment will not end well. Inflation will return to double digits like the 1980s. The U.S. dollar will resume its downtrend (it rallied this past summer within an overall bear market for the dollar). Global currencies including the U.S. dollar will weaken and investors will buy gold/silver as a flight to quality. China has become the largest gold purchaser for the first time. The West has been selling gold as the East has been buying it. The Chinese see the bubble in their economy and especially in their real estate markets. They will continue to buy gold. With the current tight supply of gold, the demand will push the gold price higher.

The previous high in gold prices was $1900/oz. in the Fall of 2011. Gold fell to $1180 and re- tested that low at the end of 2013. With the current global unrest politically in Russia/Ukraine, North Korea, and Venezuela to name a few and the economic dysfunction in Greece, Puerto Rico, and Turkey fundamentals point to a higher gold price as gold has historically been viewed as a safe haven. In the past 12 months, silver is down 23% and gold is down 15.5%. As of late February, silver is up 14% and gold is up 11%. Silver is outperforming gold so far this year and the miners associated with these commodities are majorly outperforming the metals. My clients and I are invested in these miners.

With regard to your current accounts at TD Ameritrade Institutional, you will receive a letter from them with instructions about moving your accounts to TD Ameritrade retail. By staying with TD Ameritrade, it prevents you from receiving additional 1099s next year at tax time. The accounts from TDAI to TD Ameritrade will be linked so that you receive one 1099. If you want me to continue to manage your accounts at TD Ameritrade, you will need to sign a 'trading authorization' form (I will mail this form to you within the week) and also give me access to your accounts online. TD Ameritrade can only provide one log-on per household. Therefore, you will need to provide me with that information.

I apologize for any inconvenience that this may cause. If we stay with TD Ameritrade for the remainder of the year, you will not need to sign all new paperwork with a new custodian. I want to keep it as easy as possible for clients. For those of you who receive monthly checks or ACH's directly to your bank, it will remain in effect until you move your accounts to TD Ameritrade. TD Ameritrade retail has different paperwork for this so I will send that to you as well later this week. Other than that, you won't need to sign all new paperwork with TD Ameritrade.

Ms. Fernandez signed the April 17th Counter Letter as the Manager of UFI.

### Blocking Access to Customer Accounts Is Tantamount to Terminating a Clearing Agreement "For Cause"

27.     TD Ameritrade Institutional and/or TD Clearing terminated the clearing agreement with UFI without advance notice to UFI because of UFI's wildly unsuitable trading strategies and investment choices for its customers.  Upon digging deeper into the UFI engagement at some point before April 17, 2014, TD Ameritrade Institutional and TD Clearing realized they had done a poor job of collecting KYC paperwork for UFI customers from UFI.  They learned they were missing the same KYC information that was absent from Mrs. Antczak's UFI Advisory Contract for all UFI customers despite TD Ameritrade Institutional's and TD Clearing's own KYC regulatory obligations.

28.     Despite a number of red flags flying in 2013 and early 2014, TD Ameritrade Institutional and/or TD Clearing ignored, missed or responded too meekly to UFI's ongoing, open and notorious breach of the fiduciary duty it owed to its customers.  At some point TD Ameritrade learned RIA Fernandez was basically gambling away the funds in the brokerage accounts of unsophisticated, conservative, long-term investors she had unfettered discretion to trade in. UFI's pattern of using margin, buying options, buying options on daily leveraged 300% gold bull ETFs, selling quality investments at a loss and increasingly moving UFI clients' money into larger and larger buy-and-hold positions primarily in two daily leveraged 300% gold bull ETFs was sheer lunacy.

29.     Worse yet, this 3X leveraged gold "bull" strategy was being pursued while the price of gold was in a long-term decline (gold peaked at just under $1,800 an ounce in August of 2011; UFI came into existence in June or July of 2012).  Uncovering these ever increasing over-

concentrations in two daily leveraged 300% gold bull ETFs in all, or just about all, of the accounts of UFI customers was alarming, as it would be to anyone in the BD or IA industry- just as it was to TD Ameritrade. *See* April 17th Counter Letter ("My [UFI] clients and I are invested in these miners [i.e., daily leveraged 300% gold bull ETFs].").

**Far Less Than 1% of Retail Investors Should Invest in Daily Leveraged ETFs of Any Index**

30.     Investing in daily leveraged ETFs of any index is appropriate for far less than 1% of retail investors and, arguably, for no investors because it amounts to little more than gambling at a casino rigged for investors to lose money if held onto for more than a day.  As early as 2008, financial writers wrote articles challenging the pervasiveness of taking positions in daily leveraged ETFs of any index given that such an investment was suitable for less than 1% of the population (investing in daily leveraged ETFs is unsuitable for all but the rarest of investors- more like .000001% of the investing public).

31.     Morningstar's Paul Justice, CFA, wrote an article on January 22, 2009 entitled *Warning; Leveraged and Inverse ETFs Kill Portfolios: Too many people are making sucker bets with these products*.  Mr. Justice wrote:

> We start with a suitability assessment, or our view as to which type of investor should use each specific product and how. With virtually every leveraged and inverse fund, I can tell you that they are appropriate only for less than 1% of the investing community. Considering that these funds have attracted billions of dollars over the past year alone demonstrates too many investors are using these ETFs incorrectly.

Mr. Justice continued; "In every leveraged ETF report that we write, we warn investors that the math behind daily compounding will not work because of compounding arithmetic and constant leverage, but I get the feeling that the message is not getting across."

32.     Over the time UFI was on TD Ameritrade Institutional's platform, RIA/RP Fernandez increasingly morphed UFI accounts to over-concentrating in daily leveraged 300% gold bull

ETFs in a foolhardy attempt to make up for her heavy losses from over-concentrating customers'

accounts earlier on in other unsuitable ETFs (like tickers "SLW" and "GDXJ").  Rather than take

the loss that was usually presented at the end of the trading day after taking large positions in

these daily leveraged ETFs, RIA/RP Fernandez repeatedly held onto these ETF positions-

sometimes for months on end (these daily leveraged 300% gold bull ETFs should never be held

for more than one day) which, predictably, caused devastating consequences.

33.     Holding daily leveraged ETFs for more than one day mathematically guaranteed UFI

customers would lose large amounts of money due to the deadly mixture of highly volatile

securities and daily compounding.  Mr. Justice also wrote in *Warning: Leveraged and Inverse*

*ETFs Kill Portfolios: Too many people are making sucker bets with these products*;

> That's why compounding of daily returns is the dead horse that apparently needs a little
> more beating. Leveraged and inverse ETFs are NOT meant to be held as long-term
> investments. Let me repeat myself. Very bad things not only can happen whenever you
> hold these ETFs longer than their indicated compounding period (typically one day for
> stock-based ETFs, sometimes monthly for commodities), you are almost mathematically
> guaranteed to get a return that is not double that of the index. In fact, the longer you hold
> one of these funds, the probability that you will get nothing close to double the returns
> increases. Not only will the magnitude of your returns bounce around, you might not
> even get returns that are in the same direction as the changes in the index. (I'm not
> making this up. Please look at the above graphs again).

In short, TD Ameritrade was well aware before it added UFI to the TD Ameritrade Institutional

independent RIA platform that heavy over-concentrations in daily leveraged ETFs was, *inter*

*alia*, a *per se* breach of fiduciary duty.

34.     FINRA issued its own warning on daily leveraged ETFs in a June, 2009 Regulatory

Notice entitled *Non-Traditional ETFs.*  FINRA stated in the executive summary;

> Exchange-traded funds (ETFs) that offer leverage or that are designed to perform
> inversely to the index or benchmark they track—or both—are growing in number
> and popularity. While such products may be useful in some sophisticated trading
> strategies, they are highly complex financial instruments that are typically

designed to achieve their stated objectives on a daily basis. Due to the effects of compounding, their performance over longer periods of time can differ significantly from their stated daily objective. Therefore, inverse and leveraged ETFs that are reset daily typically are unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets.

*See Non-Traditional ETFs,* FINRA Regulatory Notice 09-31, June, 2009, p. 1.

35.    FINRA's warning on buying in daily leveraged ETFs and holding them for periods longer than one day in *Non-Traditional ETFs* also noted;

Most leveraged and inverse ETFs 'reset' daily, meaning that they are designed to achieve their stated objectives on a daily basis.[] Due to the effect of compounding, their performance over longer periods of time can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time. For example, between December 1, 2008, and April 30, 2009:

➤ The Dow Jones U.S. Oil & Gas Index gained 2 percent, while an ETF seeking to deliver twice the index's daily return fell 6 percent and the related ETF seeking to deliver twice the inverse of the index's daily return fell 26 percent.

➤ An ETF seeking to deliver three times the daily return of the Russell 1000 Financial Services Index fell 53 percent while the index actually gained around 8 percent. The related ETF seeking to deliver three times the inverse of the index's daily return declined by 90 percent over the same period.

This effect can be magnified in volatile markets. Using a two-day example, if the index goes from 100 to close at 101 on the first day and back down to close at 100 on the next day, the two-day return of an inverse ETF will be different than if the index had moved up to close at 110 the first day but then back down to close at 100 on the next day. In the first case with low volatility, the inverse ETF loses 0.02 percent; but in the more volatile scenario the inverse ETF loses 1.82 percent. The effects of mathematical compounding can grow significantly over time, leading to scenarios such as those noted above.

*See Non-Traditional ETFs,* FINRA Regulatory Notice 09-31, June, 2009, p. 2.  FINRA further warned in *Non-Traditional ETFs*; "While the customer-specific suitability analysis depends on the investor's particular circumstances, inverse and leveraged ETFs typically are not suitable for retail investors who plan to hold them for more than one trading session, particularly in volatile markets." *See Non-Traditional ETFs,* p. 3.

36.     Cutting off UFI and RIA/RP Fernandez from access to UFI accounts on April 17, 2014 was a complete repudiation of the securities being purchased and strategy being employed while UFI and RIA/RP Fernandez were on TD Ameritrade Institutional's platform.  UFI falsely stated in the April 17th Counter Letter that; "TDAI has not given a particular reason for terminating my relationship with them as custodian."  TD Ameritrade and TD Clearing were emphatically clear with UFI as to why it was being terminated.  But none of the Defendants informed the SEC, FINRA or the Commonwealth of Pennsylvania in 2014 of the results of the investigation TD Ameritrade conducted before deciding to terminate UFI's clearing agreement or that TD Ameritrade would no longer take orders from UFI or its sole RIA/RP, Ms. Fernandez.  UFI could no longer perform as an IA or introducing BD as of April 17, 2014.

37.     Upon being provided evidence a BD or IA was purchasing wildly unsuitable investments and employing a wildly unsuitable investment strategy for its customers that had already resulted in significant losses for its customers, the SEC, FINRA and the Commonwealth of Pennsylvania can, each in their own right, open an investigation to research allegations of breach of fiduciary duty, unsuitability of investments and/or investment strategies, look for KYC violations, books and records violations, failure to supervise and, based upon these facts, a host of other possible claims/rule violations against UFI.  Section 80b-9a of the Investment Advisers Act of 1940, as amended, 15 U.S.C. § 80b-1 *et seq.* (the "Advisers Act") states;

> (a) **Investigation**
> Whenever it shall appear to the Commission, either upon complaint or otherwise, that the provisions of this subchapter or of any rule or regulation prescribed under the authority thereof, have been or are about to be violated by any person, it may in its discretion require, and in any event shall permit, such person to file with it a statement in writing, under oath or otherwise, as to all the facts and circumstances relevant to such violation, and may otherwise investigate all such facts and circumstances.

*See* 15 U.S. Code §80b-9(a).

38.     Some or all of these regulators could have sought a preliminary injunction or taken some other action to stop this unlawful conduct and then sought restitution to mitigate the damage done once they learned how egregiously RIA Fernandez was breaching her fiduciary duty and the losses it was causing for her UFI customers. *See, e.g.*, 15 U.S. Code §§80b-9d and 9e. These regulators could have permanently barred Ms. Fernandez from the securities industry for engaging in the activities described herein. If the TD Ameritrade Defendants had fulfilled their obligations to get a regulator involved here, based upon the knowledge they possessed, at the latest, by April 17, 2014, millions of dollars would not have been lost due to Ms. Fernandez, in her individual capacity, continuing her lunatic investment strategy for former UFI customers on TD Ameritrade Retail's platform. Regulators could have stopped the bleeding TD Ameritrade instead permitted to continue. Mrs. Antczak now steps forward and asks, via this Complaint, when exactly did it come to the attention of TD Ameritrade that UFI was, in a very notorious way, basically gambling away the money in her brokerage accounts and the accounts of other investors who were customers of UFI?

### TD Ameritrade Knew FINRA Had Fined a Number of BDs in 2012 and Forced Them to Pay Restitution to Their Customers Who Were Unsuitably Sold Daily Leveraged ETFs

39.     Given that virtually no retail investors are suitable purchasers of daily leveraged ETFs, FINRA Enforcement realized going after BDs that routinely recommended purchasing daily leveraged or inverse ETFs to their retail customers for, *inter alia*, failure to supervise was "low-hanging fruit" (FINRA refers to daily leveraged and daily inverse ETFs collectively as "non-traditional ETFs" in its AWC Letters- they shall collectively be referred to herein as "daily leveraged ETFs"). *See* Harmetz, Lloyd, *FINRA Fines Broker-Dealers for Sales of Non-Traditional ETFs*, August 28, 2017 Posted on www.bdiaregulator.com.

40.     FINRA fined FSC Securities Corporation ("FSC"), a BD with about 1,300 registered representatives ("RRs-" which sometimes herein also refers to, depending on context, RPs) and 650 branch offices, $100,000 for not performing any reasonable basis suitability analysis before recommending daily leveraged ETFs to retail customers.  FSC was also ordered to make restitution of about $500,000 to affected customers.  Even before FINRA started investigating FSC in 2010 for unsuitably recommending daily leveraged ETFs to retail customers, FSC had internally recognized the danger and volatility of such products, albeit meekly, by prohibiting its RRs from recommending to their customers any daily leveraged ETFs that sought to achieve a daily return that was more than 200% of the relevant benchmark index.

41.     FINRA found FSC's RRs made unsuitable recommendations to buy daily leveraged ETFs to many of its retail customers who had conservative or moderate investment objectives and risk tolerances, including elderly investors.  The FSC Letter of Acceptance, Waiver and Consent (a settlement agreement entered into with FINRA known as an "AWC Letter") included a list of about 110 FSC customers who were to receive restitution as a result of the FSC settlement (Attachment A of the FSC AWC Letter).  The Attachment A list included only 15 FSC customers who lost more than $10,000 due to FSC's RRs recommending the purchase of daily leveraged ETFs.  Only 2 FSC customers listed in Attachment A of the FSC AWC Letter lost more than $30,000 (the largest loss being about $39,000).

42.     FINRA gave two examples in the FSC AWC Letter to evidence how badly FSC customers suffered from its unsuitable recommendations to purchase daily leveraged ETFs.  The two examples given by FINRA were:

> An 82-year old FSC customer with a conservative risk tolerance and investment objectives of growth and income whose net worth was $500,000 held a daily leveraged ETF for 521 days in her IRA account causing a loss of $14,251; and

A 67-year old FSC customer with a moderate conservative risk tolerance and a net worth of $350,000 and investment objectives of income and growth held a daily leveraged ETF for 1,319 days in his IRA account sustaining a loss of $13,420.

43.     On May 1, 2012 FINRA executed AWC Letters with several of the largest investment banks on Wall Street for, *inter alia*, making unsuitable recommendations of daily leveraged ETFs and for failing to establish and maintain supervisory systems for these non-traditional products.  FINRA found UBS, Morgan Stanley & Co. LLC ("Morgan Stanley"), Wells Fargo Advisors, LLC (along with Wells Fargo Advisors Financial Network, LLC and Wells Fargo Investments, LLC collectively referred to herein as "Wells Fargo") and other giant investment banks had the same inexcusable shortcomings detailed in the FSC AWC Letter when it came to selling daily leveraged ETFs including allowing customers with conservative risk tolerance profiles to hold these securities for months.

44.     Just as FINRA had included bullet points in the FSC AWC Letter highlighting the most egregiously unsuitable recommendation and purchase of a daily leveraged ETF in a customer's account it uncovered during its investigation of a BD and the loss that ensued, FINRA included two examples in each of these AWC Letters with the largest investment banks.  The examples given in the UBS AWC Letter were as follows:

A 64-year old customer with a primary conservative risk tolerance profile and net worth of $290,000 held a daily leveraged ETF for 139 days in his IRA account and sustained losses of over $5,700 (43% of his initial investment); and

A 54-year old customer with a primary conservative risk tolerance profile and net worth of $400,000 held a daily leveraged ETF for 21 days and sustained losses of over $5,000.

UBS was fined $1.5 million for this unlawful conduct and ordered to provide restitution in the amount of $431,488.

45.     The examples given in the Morgan Stanley AWC Letter were as follows:

A 74-year old customer with a primary investment objective of income and a net worth under $300,000 allocated over 25% of the account to a single daily leveraged ETF that was purchased on a solicited basis and held for 128 trading days, sustaining losses of over $13,000; and

An 89-year old customer with a primary investment objective of income and a net worth under $200,000 allocated over 59% of the account to a single daily leveraged ETF that was purchased on a solicited basis and held for 39 trading days, sustaining losses of over $10,000.

Morgan Stanley was fined $1.75 million for its unlawful conduct and ordered to provide restitution in the amount of $604,584.

46.    The examples given in the Wells Fargo AWC Letter were as follows:

A 65-year old conservative customer with a stated net worth under $50,000 held a daily leveraged ETF for 43 days and sustained losses of over $25,000; and

A 92-year old conservative customer with a stated net worth under $500,000 held a non-traditional ETF for 135 days and sustained losses of over $2,000.

Wells Fargo consented to a fine in the amount of $2.1 million and restitution in the amount of $641,489.

47.    Adding up all of the losses listed in the bullet points of the AWC Letters FINRA entered into with the largest investment banks for failing to properly supervise the sale of leveraged ETFs still pales in comparison to how much money TD Ameritrade let Mrs. Antczak alone lose from UFI (and later Ms. Fernandez in her personal capacity) heavily investing her money in daily leveraged ETFs, using margin to add even more leverage, and buying options on daily leveraged ETFs- all without TD Ameritrade intervening in any meaningful way.   Indeed, Plaintiff lost more personally than the entire amount of restitution top 10 BD UBS had to pay to its customers for unsuitable sales of daily leveraged ETFs.

48.     TD Ameritrade allowed UFI and later Ms. Fernandez in her personal capacity to hold onto daily leveraged ETF positions in Mrs. Antczak's accounts for far longer than what FINRA had listed as the most egregious examples in the AWC Letters it entered into with the largest investment banks.  TD Ameritrade allowed UFI and later Ms. Fernandez in her personal capacity to over-concentrate Mrs. Antczak's money in daily leveraged ETF positions at far higher concentrations than what FINRA had listed as the most egregious examples of over-concentrations of daily leveraged ETFs in retail accounts due to solicited sales in the AWC Letters it entered into with the largest investment banks- again without any meaningful intervention by TD Ameritrade or a phone call to a regulator.

49.     The largest investment banks had entered into these AWC Letters in May of 2012 which pre-dates TD Ameritrade Institutional entering into an agreement to be provide clearing services to UFI.  Thus even before TD Ameritrade Institutional and TD Clearing accepted UFI as an introducing BD/IA on TD Ameritrade Institutional's platform, TD Ameritrade knew what it could expect to pay in fines if FINRA were to find out the TD Ameritrade family of companies was not monitoring or supervising the purchase of daily leveraged ETFs.  TD Ameritrade was on notice from these AWC Letters FINRA would seek restitution even for customers who only lost as little as one dollar from having been unsuitably recommended the purchase of daily leveraged ETFs.  TD Ameritrade was on notice as to what over-concentrations of daily leveraged ETFs and holding period lengths (i.e., anything over one day) would result in it paying a fine and restitution.

50.     In the AWC Letter LPL Financial LLC ("LPL") entered into with FINRA over its unsuitable sales and inadequate supervision of daily leveraged ETFs, it was revealed LPL's written manual of supervisory procedures ("WSPs"- all BDs and IAs must prepare this document

which details the policies and procedures they have put in place to best attempt to comply with the securities laws) did not allow allocations of leveraged ETFs in customers' accounts to exceed 15%. If the investment objective of the LPL customer was "income," no daily leveraged ETFs were permitted to be purchased in their accounts. LPL's WSPs also required its RRs to monitor on a daily basis daily leveraged ETF positions held in customer accounts. Nevertheless, LPL's unsuitable sales and inadequate supervision of daily leveraged ETFs led to a fine of $9.8 million and restitution of over $1.66 million. The LPL customer who received the largest amount of restitution got back just over $86,000; the least amount of restitution FINRA required LPL to pay a customer was $1.02.

51.     In response to the warning shot FINRA fired at BDs about their supervision of sales of daily leveraged ETFs by issuing Regulatory Notice 09-31, some BDs immediately placed restrictions on the percentage of a customer's portfolio that could be invested in daily leveraged ETFs. *See, e.g.,* AWC Letter for Stifel, Nicolaus & Company, Incorporated ("Stifel"- a clearing firm) and Century Securities Associates, Inc. ("Century"- an introducing BD), January 9, 2014 (ordering both BDs to pay a fine and make restitution to customers unsuitably put into daily leveraged ETFs even though both BDs put in place a policy enacted in June 2009 that limited daily leveraged ETF holdings to 10% of the value of an account). Coastal Equities, Inc. ("Coastal"), an introducing BD, put in place procedures which required its RRs to collect a signed "qualification agreement" from each customer prior to executing any non-traditional ETF transaction for that customer (according to its AWC Letter, Coastal did not enforce this procedure and collected zero (0) qualification agreements during the period reviewed by FINRA).

52.     All of the restrictions described in these AWC Letters were, in reality, woefully inadequate policies that still allowed RRs, for example, to recommend and purchase positions in daily leveraged 200% ETFs for customers without ending up an exception report.  Any BD that soberly faced the extreme danger lurking in owning such products and acknowledged how wildly unsuitable daily leveraged ETFs are for retail customers would have put in place a policy that limited customer accounts to holding no more than 1% of the account's value in daily leveraged ETFs on any given day, required all purchases be sold out the same day and would have not paid commission to the RR if he/she could not produce a signed qualification agreement from the customer for the purchase.

### Clearing Firms Are Liable Only When They Knew of the Securities Law Violations Committed by an Introducing BD/IA

53.     Ordinarily, a clearing BD is not held responsible when the customer of an introducing BD or IA sues claiming unsuitable trades/breach of fiduciary duty based upon the trading done by an introducing BD or an IA.  It is only when a carrying BD has direct knowledge of securities laws violations or state law violations taking place at an introducing BD or IA and does nothing of consequence to prevent said violations from continuing that it can held liable.  Knowing what they knew about UFI's and RIA/RP Fernandez's trading strategies and investments selections by April of 2014, at the latest, TD Ameritrade Institutional and TD Clearing decided they could not permit UFI to stay on TD Ameritrade's independent RIA platform while continuing to drain the assets of UFI customers following an investment strategy more akin to gambling and worlds away from carrying out UFI's and RIA Fernandez's fiduciary duties to UFI's customers.

54.     Clearing agreements include a notice of termination clause that typically provides an introducing BD/IA 30 to 60 days prior notice before a clearing agreement can be terminated "without cause" so the introducing broker/IA has time to locate another clearing firm and execute

a new clearing contract.  It is common industry practice for the 30 to 60 days allotted under the clearing agreement's notice of termination clause to stretch to 90 or more days if the BD/IA can show, in good faith, significant progress on retaining a new clearing firm.

55.    Terminating a clearing agreement such as TD Ameritrade Institutional and/or TD Clearing did to UFI on or about April 17, 2014 without notice and an opportunity to switch clearing firms is the equivalent of a "for cause" termination of a clearing agreement.   TD Ameritrade took the extreme measure of cutting off UFI's and RIA Fernandez's access to UFI's customer accounts without notice on April 17, 2014.  But TD Ameritrade did not formally label the April 17th termination as being "for cause" because that would have required TD Ameritrade to report the matter to a regulator and it had already decided, on behalf of the entire TD Ameritrade family of companies, that no company in the family would be allowed to report UFI's and/or RIA/RP Fernandez's activities to a regulator.

56.    TD Ameritrade never lifted the ban it imposed on notifying a regulator here to protect its family of companies at the expense of UFI's customers and later, former UFI customers on TD Ameritrade Retail's platform.  As the facts got worse and more companies/divisions within the TD Ameritrade family of companies became aware of the ruinous trading strategy RIA/RP Fernandez was executing and her later continuation of the wildly unsuitable strategy when she was no longer licensed by using the log-in information of former UFI customers on TD Ameritrade Retail's platform, surely one or more licensed persons and/or companies within the family questioned the wisdom of or objected to this ban.

57.    Contrary to the assertions made in the April 17th Counter Letter, UFI was not allowed any opportunity to seek some other arrangement to try to resolve its predicament.  Ms. Fernandez claimed in the April 17th Counter Letter; "[TD Ameritrade] has given me a limited timeframe to

transfer accounts[]."  This was a false statement- as stated in the April 17th Termination Letter, TD Ameritrade Institutional cut off UFI on or about April 17th and never offered UFI or RIA/RP Fernandez any opportunity to "move accounts" or make some other arrangement.  Instead, TD Ameritrade only gave Mrs. Antczak and the rest of the UFI's customers "30 days from the date of this correspondence to allow you to transfer your account to another brokerage custodian" or their accounts would be automatically transferred to the TD Ameritrade Retail Division.  TD Ameritrade knew UFI would not be able to procure another clearing agreement because UFI would be rejected during the due diligence phase a new introducing BD or IA has to endure before a clearing BD offers to enter into a clearing agreement.

58.    The April 17th Counter Letter informed UFI's customers that UFI's clearing agreement with TD Clearing was purportedly terminated "without cause."  TD Ameritrade was so alarmed by UFI's wildly unsuitable trading patterns and investment choices in UFI accounts that it deemed it best to immediately cut off UFI and RIA Fernandez from accessing UFI's customer accounts and yet TD Ameritrade Institutional and/or TD Clearing was unwilling to put in writing that the termination was "for cause."  This spared UFI and RIA/RP Fernandez the attention of regulators but also hid TD Ameritrade's lack of diligence, knowledge and complicity from regulators after letting this problem mushroom without intervening in any way prior to April 17, 2014.  But even that meager action- the freeze out and termination of the clearing agreement without notice- proved woefully inadequate for UFI customers.

59.    A clearing firm has already been found liable for facilitating an introducing BD's violation of the securities laws to make a buck off of investors foolish enough to invest in daily leveraged ETFs.  On or about February 25, 2016 the clearing firm, Wedbush Securities Inc. ("Wedbush"), entered into an AWC Letter with FINRA agreeing to pay a fine of $675,000 for

allowing an introducing broker-dealer named Scout Trading, LLC (referred to herein and in the Wedbush AWC Letter as the "Client Broker-Dealer") to repeatedly violate the rules governing fail-to-deliver activity in order to maximize the number of days the Client Broker-Dealer remained short in certain daily leveraged ETFs to take advantage of the inherent financial benefits of being short versus long daily leveraged ETF shares.  Wedbush allowed the Client Broker-Dealer to engage in a cyclical pattern of illegal activity for over two years which permitted the Client Broker-Dealer to profit at the expense of its customers from how poorly daily leveraged ETFs perform.  This activity repeatedly raised red flags but Wedbush aided and abetted the Client Broker-Dealer by choosing to ignore them knowing full-well the Client Broker-Dealer was engaging in the activity showing up on its exception reports to illegally profit on daily leveraged ETF transactions.  The Client Broker-Dealer would not have been able to make money this way if Wedbush enforced the securities laws and its contractual obligations with the ETF issuer governing fails to deliver.  The regular and extensive fails-to-deliver occurring in 14 affected daily leveraged ETFs due to the Client Broker-Dealer's naked redemption activity and trading of daily leveraged ETF shares on the secondary market eventually caught the attention of FINRA's Department of Market Regulation's Short Sale staff which prompted it to open an investigation.  FINRA found Wedbush knew of the red flags set off by the Client Broker-Dealer's chronic fails-to-deliver but, just as TD Ameritrade in the instant action, Wedbush took no meaningful action to put a stop to an activity it knew was illegal.

60.     The decisions TD Ameritrade made surrounding the termination of UFI's clearing firm agreement were taken to protect the TD Ameritrade Defendants by keeping this matter off the radar of TD Ameritrade's regulators.  Had TD Ameritrade informed regulators about UFI and RIA/RP Fernandez or put in writing UFI was terminated "for cause," those same regulators

would have ended up asking TD Ameritrade the same question Mrs. Antczak poses in this Complaint; When exactly did it come to the attention of TD Ameritrade Institutional and/or TD Clearing that UFI and RIA/RP Fernandez were basically gambling away millions of dollars in a very notorious way in the accounts of investors who were customers of UFI?

### Despite No Longer Being Licensed, Ms. Fernandez Resumes Acting as a RIA for Former UFI Customers in Their TD Ameritrade Retail Accounts

61.    Since no regulator had been tipped off about UFI's and RIA/RP Fernandez's activities, and UFI was only terminated "without cause" in writing, RIA Fernandez and UFI remained free from regulatory scrutiny.  This allowed Ms. Fernandez to carry out the plan she had described in the April 17th Counter Letter- Ms. Fernandez individually would resume discretionary trading in the accounts of former UFI customers once they were moved to TD Ameritrade Retail if they chose to retain her as their "advisor" after April 17, 2014.  Ms. Fernandez would simply log in to the accounts created on TD Ameritrade Retail's platform for former UFI customers.

62.    The April 17th Counter Letter told UFI's customers they were simply having their accounts switched from TD Ameritrade Institutional to TD Ameritrade Retail. *See* April 17th Counter Letter ("I am writing to let you know that TD Ameritrade Institutional will be sending you a letter soon to transfer your accounts to their retail arm TD Ameritrade.").  The April 17th Counter Letter pretended UFI was still a functioning BD or IA when, in fact, it was neither.  It was also a false statement UFI could operate thru TD Ameritrade Retail after being kicked off TD Ameritrade Institutional. *See* April 17th Counter Letter ("If we stay with TD Ameritrade retail, my clients don't have to sign all new paperwork either.").  UFI falsely stated in the April 17th Counter Letter it was searching for a custodian to replace TD Clearing.  The April 17th

Counter Letter noted that if UFI's customers became customers of TD Ameritrade Retail, Ms. Fernandez could;

> remain as [your] portfolio manager. I can do so after your accounts are moved to the retail accounts with TD Ameritrade. If we stay with TD Ameritrade retail, my clients don't have to sign all new paperwork either. It should only require one signature requesting the accounts to be moved.

63.     TD Ameritrade Retail's platform is only for self-directed retail brokerage accounts; licensed RIAs and RRs are not permitted to run an IA or BD business via TD Ameritrade Retail's platform.  The April 17th Counter Letter stated UFI customers who wanted Ms. Fernandez to continue to manage their accounts at TD Ameritrade Retail would need to sign a trading authorization form and that Ms. Fernandez would "mail this form to you within the week."  No such form was ever submitted to TD Ameritrade Retail for former UFI Customers who gave Ms. Fernandez access to their accounts on TD Ameritrade Retail's platform because TD Ameritrade Retail does not recognize or support RIAs or RRs on its platform.  Further, after it learned the details behind TD Ameritrade Institutional and/or TD Clearing cutting off and freezing out UFI and RIA/RP Fernandez from UFI's book of business, TD Ameritrade Retail was not going to grant UFI or Ms. Fernandez in her personal capacity discretionary trading authorization for former UFI customers on its platform.

64.     UFI customers who became customers of TD Ameritrade Retail and provided their TD Ameritrade Retail log-in information to Ms. Fernandez lost millions of dollars in their TD Ameritrade Retail accounts after April of 2014.  TD Ameritrade figured out rather quickly Ms. Fernandez was managing portfolios of former UFI Customers on its Retail platform but again was slow to respond and when the response came, it was again meek and quickly circumvented which caused things to only get worse.

**Ms. Fernandez Resumes the Wildly Unsuitable Investment Strategy Using Wildly
Unsuitable Investments on TD Ameritrade Retail's Platform**

65.     On or about May 8, 2014, Mrs. Antczak's brokerage account ending in x235 at TD
Ameritrade Institutional (the "x235 account") became the "x917 account" when Mrs. Antczak's
accounts were transferred to TD Ameritrade Retail.  Mrs. Antczak's IRA, the "x286 account" at
TD Ameritrade Institutional, became the TD Ameritrade Retail IRA "x937 account."

66.     In the April 17th Termination Letter, TD Ameritrade Institutional informed Mrs.
Antczak; "Because of the transition to a self-directed retail account, your account number will
change and any cash management services or option approval you had on your advisor-managed
account will cease."  TD Ameritrade's removal of option and margin privileges was a good thing
because RIA Fernandez, with TD Ameritrade's full knowledge, had been unsuitably using
margin and buying options routinely in the x235 account while Mrs. Antczak was a UFI
Customer.

67.     Ms. Fernandez orchestrated getting option privileges resumed for Mrs. Antczak's
accounts as well as the use of margin once they were moved to TD Ameritrade Retail even
though both were wildly unsuitable for Mrs. Antczak.  On June 3, 2014, Ms. Fernandez bought a
put option on a daily leveraged 300% gold bull ETF (ticker "NUGT") in Mrs. Antczak's IRA
x937 account and a put option on NUGT and daily leveraged 300% gold bull ETF (ticker
"JNUG") in Mrs. Antczak's x917 account.  Given that Mrs. Antczak was a retired schoolteacher
with no investing experience, how did option purchases and margin use get approved so quickly
by TD Ameritrade Retail now that her accounts were "self-directed?[2]"  Ms. Fernandez would

---

[2] When an investor normally fills out an application to have a retail account with TD Ameritrade
that allows buying on margin and option trading, they must describe their financial situation
which TD Ameritrade reviews before considering whether to permit these risky and sophisticated

have had to make false statements on the form(s) TD Ameritrade Retail requires retail investors

to complete in order to gain option trading privileges on the TD Ameritrade Retail platform as to

Mrs. Antczak's trading experience, intentions for purchasing options and who would actually be

making the option-buying decisions.  Buying options on daily leveraged 300% ETFs is *per se*

unsuitable because it requires the daily leveraged 300% ETF be held for longer than one day.

**TD Ameritrade Meekly Attempts to Impede Ms. Fernandez's Continued Use of a Wildly
Unsuitable Investment Strategy in Wildly Unsuitable Investments on TD Ameritrade
Retail's Platform for Former UFI Customers**

68.     TD Ameritrade wrote a letter dated February 2, 2015 to a former UFI customer (not Mrs.

Antczak) whose TD Ameritrade Retail brokerage account was also still being "managed" by Ms.

Fernandez on a discretionary basis (the "Fernandez Removal Letters").  The Fernandez Removal

Letters read as follows:

> Dear [former UFI customer/current TD Ameritrade Retail customer]:
>
> Our records indicate you may have given an advisor, Bridget Fernandez, online access or
> Limited Power of Attorney/trading authority, to act on your behalf within your brokerage
> account(s). TD Ameritrade does not allow advisors to operate on our Retail Platform.
> As a result, Limited Power of Attorney/trading authority for Bridget Fernandez has been
> removed from your account.  This means Bridget Fernandez will no longer be able to

---

activities to take place in an account.  When someone wants to trade on margin, they have to
reveal their annual income, approximate net worth (less their residence) and their approximate
liquid net worth.  When someone wants to trade options, they have to list their; 1) number of
dependants, 2) years of investing experience, 3) investment knowledge and education, 4) type of
transactions anticipated, 5) what their option investment objectives are, and 6) types of trades
that will take place in the account (tier 1 is the most basic option trading and tier 4 is advanced).

manage your account or trade on your behalf. Bridget Fernandez has been notified of this decision.

To ensure advisory activity cease immediately, your online access has been restricted. In order to remove the restriction, you must change your login credentials on all of your accounts by calling Client Services. We ask that you do not supply the updated credentials to Bridget Fernandez (or any unauthorized party) moving forward.

You will not be required to remove your account(s) from TD Ameritrade provided the advisory relationship is fully dissolved; however, failure to discontinue the advisory relationship may cause TD Ameritrade to re-evaluate our business relationship with you.

While your account is your responsibility, you are not alone. TD Ameritrade remains committed to providing you with support while you pursue your financial goals. If you have any questions or require any assistance, please do not hesitate to contact us. Client Service Representatives are available 24 hours a day, seven days a week at 1-800-669-3900.

Thank you for choosing TD Ameritrade for your financial needs. We value your business and look forward to serving you for many years to come.

The Fernandez Removal Letters were signed by Brian Tessman, Retail Risk Management, TD Ameritrade in Omaha, NE.

69.     In the Fernandez Removal Letters, TD Ameritrade referred to Bridget Fernandez as an "advisor" even though it knew she was no longer licensed (as a RIA or RP). UFI's Pennsylvania IA license had been terminated at least three months before TD Ameritrade Retail sent out the Fernandez Removal Letters. When a broker/dealer the size of TD Ameritrade refers to someone as an "advisor" in a letter, it legitimizes them in the eyes of, in this instance, former UFI customers; it gives the impression Ms. Fernandez was still licensed and therefore worthy of their trust. Compounding this error, the Fernandez Removal Letters referred to Ms. Fernandez and/or her activities five (5) times as that of an "advisor" or that an "advisory relationship" existed between Ms. Fernandez (in her personal capacity) and the recipients of the Fernandez Removal Letters which again served to legitimize Ms. Fernandez and her wildly unsuitable investment

strategy to the investors who entrusted Ms. Fernandez with their hard-earned money after the freeze out.

70.     The Fernandez Removal Letters read as follows:

> Our records indicate you may have given an advisor, Bridget Fernandez, online access or Limited Power of Attorney/trading authority, to act on your behalf within your brokerage account(s). TD Ameritrade does not allow advisors to operate on our Retail Platform.

It was false for TD Ameritrade to state in the Fernandez Removal Letters that its "records indicate" Ms. Fernandez had trading authority in the accounts of former UFI customers.  No such record exists.  Via surveillance or exception reports, TD Ameritrade's Retail Risk Management department or a similar department figured out Ms. Fernandez was trading in the accounts of former UFI customers after being frozen out when she ran UFI.  It was also false for the Fernandez Removal Letters to state; "TD Ameritrade does not allow advisors to operate on our Retail Platform" because even its current client agreements available on its website for self-directed TD Ameritrade Retail accounts acknowledge customers may be using an advisor or RR to make investment decisions in their brokerage accounts.  TD Ameritrade made this false statement to hide the fact that it was singling out Ms. Fernandez for removal from the TD Ameritrade Retail platform due to the huge liability she had become for the TD Ameritrade Defendants in terms of fines and restitution for blowing up their exception reports as were other similar rogue former RIAs or RRs who were engaging in wildly unsuitably over-concentrating their former customers' new brokerage accounts in daily leveraged ETFs and engaging in a wildly unsuitable buy-and-hold strategy with these investments.

71.     TD Ameritrade knew since April 17, 2014 UFI was no longer a functioning BD or IA which meant Ms. Fernandez, who was only licensed through UFI, was also no longer licensed as a RIA or RP and thus TD Ameritrade was the only BD tasked with a legal duty to look out for

Mrs. Antczak and the recipients of the Fernandez Removal Letters.   Both TD Ameritrade Institutional and TD Ameritrade Retail had kicked Ms. Fernandez off of their platforms and still no company in the TD Ameritrade family- many of them holding securities licenses- informed a regulator of that fact or informed a regulator about UFI or Ms. Fernandez in her individual capacity.   TD Ameritrade chose not to bring the activities of Ms. Fernandez in her individual capacity to the attention of any regulatory authorities around the time TD Ameritrade issued the Fernandez Removal Letters to protect TD Ameritrade from regulatory scrutiny which could have involved a regulator asking why TD Ameritrade/TD Clearing cleared and watched while Ms. Fernandez resumed gambling away the money in the accounts of TD Ameritrade Retail customers whose misfortune was that they had been customers of UFI and TD Ameritrade Institutional.

72.     Neither letter discussed herein from TD Ameritrade informed the recipients that TD Ameritrade, TD Clearing, UFI, RIA Fernandez and/or Ms. Fernandez in her individual capacity were in breach of their respective fiduciary duties to UFI customers/former UFI customers. Neither letter informed the recipients what TD Ameritrade knew- UFI and then Ms. Fernandez had employed a wildly unsuitable investment strategy using wildly unsuitable investments putting their accounts in a virtual financial death spiral.   TD Ameritrade failed to inform the recipients of the Fernandez Removal Letters that if they continued to allow Ms. Fernandez in her individual capacity to serve as their "advisor" and manage their TD Ameritrade brokerage accounts and over-concentrate their money in buy-and-hold positions in extremely volatile, daily leveraged 300% gold bull ETFs, they could expect to lose all, or most of, the money in their brokerage accounts.   Neither letter informed the recipients that other than the occasional letter to UFI customers/former UFI customers and verbal scoldings delivered to Ms. Fernandez, TD

Ameritrade intended to do nothing else but clear these daily leveraged ETF trades and silently watch the horror show.

73.     Neither letter from TD Ameritrade informed UFI customers/former UFI customers that Ms. Fernandez was not licensed and could be subject to criminal prosecution for managing accounts of former UFI customers on TD Ameritrade Retail's platform if she was accepting compensation for doing so.   Neither the April 17th Termination Letters nor the Fernandez Removal Letters warned UFI customers/former UFI customers, respectively, that they should contact the SEC, FINRA, the Commonwealth of Pennsylvania or some other regulator in order to stop UFI and later Ms. Fernandez personally from gambling away the money in their brokerage accounts.

74.     After TD Ameritrade Retail made its customers who received the Fernandez Removal Letters change their passwords, Ms. Fernandez again convinced these former UFI customers that it was in their best interests to have her serve as the "advisor" for their brokerage accounts by providing her their new log-in information.   Thus she circumvented this second freeze out the same way she had circumvented TD Ameritrade Institutional's ban of her and UFI.   At some point after the second freeze out of Ms. Fernandez, TD Ameritrade became aware Ms. Fernandez was again executing trades in the TD Ameritrade Retail accounts of former UFI customers following her same wildly unsuitable trading strategy resulting in further damages.

**How RIA Fernandez Got UFI Kicked Off TD Ameritrade's Institutional Platform**

75.     While Mrs. Antczak's account was still at UBS, her portfolio was pretty typical for a retired schoolteacher- about a third of it was in bonds, the rest was in cash, stocks and preferred stocks.   Commodities as a portion of Mrs. Antczak's portfolio in one account at UBS had gone from *de minimus* to about 9% of the portfolio at the time UBS terminated RIA Fernandez in

February of 2012.  When Mrs. Antczak transferred her accounts to UFI sometime around July of 2012, she had just over $660,000 between the two accounts now entrusted to UFI, TD Ameritrade Institutional and TD Clearing.  RIA Fernandez knew these two accounts held the entire brokerage portfolio holdings of Mrs. Antczak so diversification would be an important investment objective.  Nevertheless, by January of 2014, 75% of the x235 account was invested in just one daily leveraged 300% gold bull ETF-NUGT; as a consequence, the x235 account had lost about 45% of its value from the end of 2012.

76.     UFI and RIA/RP Fernandez were summarily banished from TD Ameritrade's IA platform because the securities purchased, strategy employed, use of margin and options grew worse and worse while UFI was clearing thru TD Clearing.  TD Ameritrade would have known, for example, that RIA Fernandez sold on April 19, 2013 a position in GDXJ at a loss of $11,000 (which was almost half of Mrs. Antczak's principal in the position).

77.     The ticker "GDXJ" is the VanEck Vectors Junior Gold Miners ETF.  VanEck Vectors Junior Gold Miners ETF seeks to replicate as closely as possible the price and yield performance of the MVIS™ Global Junior Gold Miners Index (the "Junior Gold Miners Index").  According to the prospectus about GDXJ dated May 1, 2017 (the "2017 GDXJ Prospectus"); "The Junior Gold Miners Index is … intended to give investors a means of tracking the overall performance of small-capitalization companies that are involved primarily in the mining for gold and/or silver."  According to the GDXJ Prospectus, the annual total return of GDXJ on a calendar year basis as a percentage is as follows:

| 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
|  |  |  |  |  |
| -34.57% | -16.07% | -60.95% | -21.60% | -19.48% |

Thus the due diligence RIAs/RRs are to perform on a security before investing a customers' money in it should have rejected this ETF as unsuitable for any of UFI's customers.

78.     According to the 2017 GDXJ Prospectus, the "PRINCIPAL RISKS OF INVESTING IN THE FUND" include; "Investors in the Fund should be willing to accept a high degree of volatility in the price of the Fund's Shares and the possibility of significant losses. An investment in the Fund involves a substantial degree of risk."  According to the 2017 GDXJ Prospectus:

> Risk of Investing in Gold and Silver Mining Companies.
> The Fund will be sensitive to changes in, and its performance will depend to a greater extent on, the overall condition of the [mostly small] gold and silver mining companies. Investments related to gold and silver are considered speculative and are affected by a variety of factors. Competitive pressures may have a significant effect on the financial condition of gold mining and silver mining companies. Also, gold and silver mining companies are highly dependent on the price of gold bullion and silver bullion, respectively, and may be adversely affected by a variety of worldwide economic, financial and political factors. The price of gold has fluctuated in recent years and may continue to fluctuate substantially over short periods of time so the Fund's Share price may be more volatile than other types of investments.

> *                            *                            *

> A significant amount of the companies in the Junior Gold Miners Index may be early stage mining companies that are in the exploration stage only or that hold properties that might not ultimately produce gold or silver.

This boilerplate language quoted above from the 2017 GDXJ Prospectus would have appeared in all prior prospectuses issued concerning GDXJ.

79.     Despite losing $11,000 on April 19, 2013 from buying and holding unsuitable GDXJ, RIA Fernandez took 6 more positions in GDXJ in Mrs. Antczak's accounts over the next month and each time cashed out at a loss.  RIA Fernandez purchased over $275,000 of GDXJ and executed 8 transactions in the 2013 calendar year losing money each time- a loss of over $71,000 for Mrs. Antczak in this security.  Despite losing over $71,000 in Mrs. Antczak's account by buying a wildly unsuitable E&P-gold-index-mimic ETF like GDXJ, RIA/RP Fernandez, in an act

of desperation, decided to migrate over to trading even more speculative and more volatile investments- daily leveraged 300% gold bull ETFs based upon the same index (even though the price of gold was plummeting the entire time UFI was in business).

80.     In order to free up cash to engage in large, buy and hold transactions in daily ETF GDXJ and other wildly unsuitable securities in 2013, RIA/RP Fernandez sold off quality investments in Mrs. Antczak's accounts.  For example, Mrs. Antczak's x235 account year-end summary for 2013 shows that during a 3 month period in 2013, RIA Fernandez sold off over a hundred thousand dollars of Apple Inc. (ticker "AAPL") causing a loss of almost $18,000 or about $6,000 lost per transaction.  These AAPL sales were not in Mrs. Antczak's best interests- especially considering what was done next with the proceeds of these stock sales.

81.     TD Ameritrade also stood by while UFI/RIA Fernandez traded Silver Wheaton Corp. (ticker "SLW") in Mrs. Antczak's accounts.  RIA Fernandez took several large, buy-and-hold positions in SLW but lost money on 4 transactions causing a total loss of $60,208 to Mrs. Antczak or about $15,000 on each position in 2013.  RIA Fernandez made almost $7,000 in profit from trading SLW options in 2013 in Mrs. Antczak's account but that hardly salved the wound created by the $60,208 loss in principal on SLW that year.

82.     TD Ameritrade permitted UFI/RIA Fernandez to regularly use margin in the accounts of UFI customers to finance buy-and-hold transactions in daily ETFs even though the use of margin was inappropriate for UFI customers based upon their investment objectives and sophistication. Mrs. Antczak paid just over $2,000 in margin interest in 2013 but does not know what margin is. TD Ameritrade/TD Clearing just cleared and watched while UFI/RIA Fernandez regularly bought options in the accounts of UFI customers in 2013 even though the purchase of options was inappropriate for UFI customers based upon their investment objectives.

**UFI's Wildly Unsuitable Trading Strategy Went On Notoriously All During 2013**

83.     The wildly unsuitable trading strategy UFI and RIA/RP Fernandez were employing in breach of their fiduciary duties to UFI's customers was going on all during 2013.  Did TD Ameritrade Institutional and TD Clearing really only learn about this chronic breach of fiduciary duty owed to UFI customers on or about April 17, 2014?  It had been going on for at least 16 months- notoriously all thru 2013.  The reason why it suddenly became unacceptable to TD Ameritrade on or about April 17, 2014 will have to await discovery.

84.     The first time margin was used in Mrs. Antczak's x235 account by UFI was sometime around March of 2013.  Mrs. Antczak's x235 account ended March 2013 with a margin debt of over $29,000 and short positions in options valued at $(8,000.00).  RIA/RP Fernandez increased the number of Silver Wheaton Corp. shares (SLW) to 5,000 shares in the x235 account as of March 31, 2013 (up from 2,000 as of January 31, 2013).  Valued at $31.35 on March 31, 2013, the position was valued at $156,750 after UFI bought 3,000 more shares of SLW on March 18, 2013 at $33 a share.  As of March 31, 2013, Mrs. Antczak's x286 account had 2,500 shares of SLW valued at $31.35 per share so the SLW position in that account was valued at $78,375. Combined, Mrs. Antczak owned over $225,000 worth of SLW, a serious over-concentration in one unsuitable investment as the price per ounce of precious metal commodities continued to slide.

85.     Silver has performed largely in step with gold over the last 10 years.  It hit a high just under $49 on or about April 28, 2011 and then followed the same pattern as gold, sliding from that 2011 high (even though it would occasionally pop back up on its way down) to a price per ounce of $19.74 on April 14, 2014.  Even though some financial writers in and around April of 2014 issued commentary/press releases advocating long-term investment in physical metals,

these same writers warned not to; invest in gold or silver ETFs, trade futures options or other leveraged paper gold and silver products (because of the extreme risk involved in leveraged products), or buy gold and silver on margin. RIA/RP Fernandez was utilizing all of these wildly risky practices <u>at</u> <u>the</u> <u>same</u> <u>time</u> in the accounts of all of UFI's customers regardless of what their respective investment objectives were.

86.     As of April 30, 2013 the x235 account lost about $76,000 of its value from the prior month (and the x286 account had fallen just over $45,000 in value from the prior month) because, for one thing, there was a 5 for 1 reverse split in NUGT on April 2, 2013. NUGT was valued at $5.62 per share on March 31, 2013 and should had risen to a theoretical $28.1 per share due to the reverse split; instead it closed at $12.94 on April 30th. Despite the red flag a reverse split indicates for a security's vitality, RIA/RP Fernandez bought another 2,200 shares of NUGT at the end of April of 2013 in the x235 account while selling off $41,000 worth of AAPL at a loss to generate the cash to do these transactions.

87.     As of May 31, 2013, the x235 account's margin loan was over $77,000 and it had short option positions valued at just over $(4,000.00) as RIA/RP Fernandez heavily, foolishly, built up the position in NUGT to 9,500 shares by month end. Also during May of 2013, RIA/RP Fernandez was selling shares of AAPL to buy more NUGT (Mrs. Antczak's position in wildly unsuitable NUGT went from 1,200 shares in April to 4,000 shares by the end of May in the x286 account). NUGT was not the only wildly unsuitable investment RIA Fernandez was buying in Mrs. Antczak's brokerage accounts around this time- for example, on May 22, 2013 UFI bought over $31,000 of Direxion Investments Inc. ("Direxion") daily leveraged 300% semiconductor bull ETF (ticker "SOXS").

88.     By the start of June of 2013, RIA/RP Fernandez's wildly unsuitable trading strategy with wildly unsuitable securities had managed to lose $228,000 between the 2 accounts UFI was managing for Mrs. Antczak (about 32% of their combined value).  RIA Fernandez again created massive positions in wildly unsuitable NUGT in both accounts in June of 2013.  This extremely risky strategy resulted in Mrs. Antczak's accounts falling another $140,000 in value in June.  UFI had lost 52% of what Mrs. Antczak had at the beginning of 2013 in just 6 months' time.  UFI now had 17,000 shares of NUGT in the x235 account which closed at $5.86 on June 30, 2013.

89.     In July of 2013, RIA/RP Fernandez sold out the last suitable investment in the x286 account, AAPL, to buy over $45,000 more of NUGT into Mrs. Antczak's IRA and sold out the only fixed income position in the x235 account to buy more NUGT.  NUGT now accounted for about 70% of the assets in the x235 account.  RIA/RP Fernandez also sold out about $42,000 of safe, suitable AAPL in the x235 account to buy more NUGT.

90.     On August 20, 2013, NUGT had another reverse split, this time it was 1 share for every ten (10) shares.  The price of NUGT was in the $90-$100 range initially after the split but NUGT closed on August 31, 2013 at $76.03.  Also in August of 2013, UFI sold out most of the SLW position, causing a massive loss in the account, only to continue buying wildly unsuitable securities primarily issued by Direxion Investments.  By the end of August of 2013, over half of the assets (based upon market value) in Mrs. Antczak's TD Ameritrade Institutional brokerage accounts were comprised of the wildly unsuitable NUGT and there was also $65,000+ in margin debt.  The price of NUGT closed on September 30, 2013 at $50.26 and yet RIA/RP Fernandez continued buying it in Mrs. Antczak's TD Ameritrade accounts.

91.     The month of November of 2013 was another brutal one for Mrs. Antczak under the "strategy" UFI was employing- Mrs. Antczak's two accounts at TD Ameritrade Institutional lost 25% of their value that month alone as almost $93,000 in value vanished.   By the end of November of 2013, 94% of the assets by market value in the x286 account were invested in NUGT; by the end of December of 2013, about 85% of the assets by market value in the x235 account were in NUGT.   NUGT closed on December 31, 2013 at $27.41.   Despite the dire situation created by over-concentrating in a single, wildly unsuitable daily leveraged 300% gold bull ETF in the accounts of most or all of UFI's customers' TD Ameritrade Institutional brokerage accounts, RIA/RP Fernandez kept on buying NUGT unrepentantly and hoping for a different result.   RIA Fernandez bought $47,000 of NUGT on December 4, 2013 in one of Mrs. Antczak's accounts only to then sell out the position on December 27, 2013 for a few hundred dollars in profit.   Tax documents prepared by TD Ameritrade Institutional for Mrs. Antczak's x235 account for 2013 reveal there was almost $23,000 in disallowed wash sales for the year- another red flag that an introducing BD/IA on TD Ameritrade Institutional's platform is following an unsuitable investment strategy in a customers' brokerage account because wash sales (for tax purposes) come from repeatedly buying and selling the same security as its price is declining.

92.     UFI frequently took large positions in daily leveraged 300% ETFs in Mrs. Antczak's accounts but then held onto the positions for more than a day because of how badly these wildly unsuitable investments sank in just one day.   UFI would then foolishly double down (and sometimes triple down) (i.e., buy more of the same unsuitable investment as the initial position was tanking and the daily leveraged 300% ETF's price continued to plunge).   This style of trading and these investments were wildly unsuitable for UFI's customers- unsophisticated,

conservative or growth long-term investors.  As RIA/RP Fernandez became more desperate to make back all the money she had lost for UFI customers over the last year, her trading strategy and choice of investments became more and more wildly unsuitable.  UFI ended up selling everything in Mrs. Antczak's TD Ameritrade accounts that was not a gold or silver ETF to fuel this insane strategy.

93.    When a customer or the RIA/RP managing their portfolio decides that it is in the best interest of the investor to over-concentrate their portfolio in just one or two securities, ordinarily the RIA/RP or the IA/BD they work for will require the customer to sign a form acknowledging the heightened risk associated with such a risky strategy.  Coastal required (but did not enforce) that customers sign a qualification agreement when buying daily leveraged ETFs in any concentration.  Indeed, everyone is familiar with the idiom that a person should "never put all of their eggs in one basket" and that could never be more true than when it comes to all of the money a person has saved to live out their years in retirement.  However, despite 94% of the assets by market value in the x286 account being invested in NUGT by the end of November of 2013 and about 85% of the assets by market value in the x235 account being invested in NUGT by the end of December of 2013, TD Ameritrade Institutional and TD Clearing never asked RIA/RP Fernandez or UFI to produce any documents signed by Mrs. Antczak (or any other UFI customer) acknowledging the extreme risk presented by this strategy.

94.    According to the FSC AWC Letter, FSC did not produce exception reports nor create any alerts in its trade review system that addressed the risks of daily leveraged ETFs.  FINRA faulted FSC for not implementing a supervisory system based upon objective information FSC possessed such as the customer's age, investment objective, risk tolerance and/or financial profile to review for suitability the recommendation by its RRs that FSC customers buy daily

leveraged ETFs.  Additionally, despite knowing the danger posed by any investment strategy that included holding daily leveraged ETF positions for more than one calendar day, for several years FSC did not develop any system to monitor, review or evaluate the length of the holding periods for daily leveraged ETFs in retail accounts.

95.     Exception reports for introducing BDs like FSC are usually created and provided by their respective clearing firms.  Thus when an introducing BD is not sufficiently monitoring some aspect of its trade data, it usually means its clearing firm is also not properly monitoring the same activity.  Clearing firms possess all of the same data introducing BDs have in order to monitor trading in daily leveraged ETFs.  Clearing firms know for each brokerage account the customer's age, investment objective, risk tolerance, financial profile and whether the account was being managed on a discretionary basis. *See* Securities Exchange Act, §§240.17a-3(a)(17)(i)(A), 240.17a-3(a)(17)(ii).  Clearing firms also know what percentage of the assets in each brokerage account are invested in daily leveraged ETFs and how long those positions are being held.  In short, TD Ameritrade possessed, for years, the information it needed to generate exception reports to escalate red flags evidencing an introducing BD or IA was employing a wildly unsuitable investment strategy using wildly unsuitable investments that daily leveraged ETFs are for retail accounts and yet it did not create and/or act upon these exception reports.  Did UFI ever have to explain its trading strategy in most or all of UFI customers' accounts to TD Ameritrade that was causing huge losses and its trades to show up almost daily on exception reports that monitored, for example, the number of days daily leveraged ETFs were being held in retail accounts of an IA where the RIA had discretionary authority?

96.     The *FINRA Fines Broker-Dealers for Sales of Non-Traditional ETF* article noted FSC

implemented a monthly report to monitor daily leveraged ETFs holdings in retail customer accounts in May of 2012 (most likely in response to the release of the AWC Letters with several of the largest investment banks discussed above).  But even after FSC had in place a program to monitor this trading activity, many of its retail customer accounts held daily leveraged ETFs for long periods of time (in some cases, more than 1,000 days).  The *FINRA Fines Broker-Dealers for Sales of Non-Traditional ETF* article noted; "Retail customers holding these ETFs for extended periods of time incurred significant losses."  TD Ameritrade knew such losses were inevitable when customers held daily leveraged ETFs for long periods of time and it had in place systems to monitor such activity and yet, as the UFI situation demonstrates, TD Ameritrade either ignored the red flags or, like FSC, shrunk like a violet when it came to taking meaningful action to stop UFI or later Ms. Fernandez in her personal capacity.

97.     Despite getting killed on buying and selling NUGT, GDXJ and SLW in Mrs. Antczak's TD Ameritrade Institutional accounts in short-term transactions in 2013, UFI continued buying these same speculative, volatile securities in 2014 like nothing bad had happened in 2013.  For example, RIA/RP Fernandez bought 500 shares of SLW on January 2, 2014 (only to sell out the roughly $10,000 position on January 14, 2014 for a $300 profit- not including trading costs) despite losing over $50,000 of Mrs. Antczak's money trading SLW in 2013.  RIA/RP Fernandez opened a new position in SLW a week later on January 21st in both the x235 and x286 accounts. When RIA/RP Fernandez sold out the 300 shares of SLW she bought on January 21, 2014 (a roughly $7,000 position) on February 10, 2014, it was for a profit, before accounting for trading costs, of less than $200.  Despite the disastrous results UFI had in trading the wildly unsuitable NUGT in 2013, UFI began heavily buying in the x235 account another daily leveraged 300% gold bull ETF created by Direxion (ticker "JNUG") in addition to buying more NUGT.

98.     The brokerage statements issued to Mrs. Antczak for the month of April, 2014 no longer had UFI's name on them.  On or about May 8, 2014 TD Ameritrade Institutional transferred what was left in Mrs. Antczak's accounts to TD Ameritrade Retail.  The brokerage statements TD Clearing sent out to Mrs. Antczak while she was a customer of UFI/TD Ameritrade Institutional only showed the market value of each security in her accounts multiplied by the number of shares held.  Once Mrs. Antczak was switched over to TD Ameritrade Retail, the TD Ameritrade Retail brokerage statements showed how underwater the positions created by UFI were while TD Ameritrade Institutional and TD Clearing watched by also showing cost and "Unrealized Gain(Loss)" on the brokerage statements former UFI customers now received because they were on TD Ameritrade Retail's platform.

99.     For example, the TD Ameritrade Retail brokerage statements showed NUGT closed at $29.02 a share on May 31, 2014 whereas the average cost per share of the 2,400 shares UFI had purchased was $97.03.  This meant Mrs. Antczak was sitting on an unrealized loss of over $163,000 in the x937 account and an even larger unrealized loss for NUGT in her x917 account when TD Ameritrade Institutional or TD Clearing froze out UFI from its customers' accounts but did not tell a regulator.  The only position that was not underwater was a $5,000 position (ticker "MOS") which was sold on May 29, 2014 as Ms. Fernandez sought to free up any remaining cash to continue pursuing the same wildly unsuitable strategy that got UFI kicked off of TD Ameritrade Institutional's platform for cause.

**Ms. Fernandez Convinces Former UFI Customers She Is a Better Advisor For Them Than TD Ameritrade**

100.    When customers see the total value of their portfolios in their brokerage accounts rapidly shrinking, they are going to ask the professional they entrusted their brokerage accounts to about what should be done to have a better result from investing.  When RIA/RP Fernandez was

questioned by concerned UFI customers about why they should continue to have Ms. Fernandez manage their brokerage accounts after TD Ameritrade sent out the April 17th Termination Letters, Ms. Fernandez told them that if TD Ameritrade managed their accounts, it would sell out their large positions in NUGT and JNUG immediately causing huge losses. Ms. Fernandez told them she would not sell out these positions if the former UFI customer allowed her to continue as their "advisor" by logging in as them in their TD Ameritrade Retail brokerage accounts.

101.    Another reason Ms. Fernandez told UFI customers it was in their best interests to retain her as their portfolio manager despite heavy losses in their accounts leading up to the April 17th Termination Letter was that she would share in their losses if gold continued to decline in value (RIAs and RPs are only allowed to share in the losses of a customer's account under limited circumstances- none of which would apply here). Ms. Fernandez told former UFI customers they should allow her to continue to manage their ever-shrinking portfolios in their TD Ameritrade Retail brokerage accounts because she (or UFI) had entered into one or more futures contracts back in June of 2013 to hedge UFI taking such large positions in daily leveraged 300% gold bull ETFs in most of or all the accounts of UFI customers and she (or UFI) would only share the proceeds from that hedge (i.e., pay back some of the sizeable losses Mrs. Antczak and other UFI customers suffered in their UFI brokerage accounts) if the former UFI customer retained Ms. Fernandez as the "advisor" of their accounts once they were located on TD Ameritrade Retail's platform.

102.    Former UFI customers stuck in the position they were by TD Ameritrade allowing RIA/RP Fernandez to follow a wildly unsuitable investment strategy using wildly unsuitable investments for a lengthy period of time reasonably believed the only way out of this mess was to stay with the "advisor" who told them only she could get them out of this mess, and if not,

would share in their losses.  In short, Ms. Fernandez told UFI customers TD Ameritrade would

dig them deeper into the hole and, unlike UFI/Ms. Fernandez, offered no potential to pay back

any of their losses, which, to unsophisticated investors, made her the logical choice under the

circumstances.  IA customers rarely move from one RIA to another RIA.  According to a

PriceMetrix report dated March 30, 2015, RIAs' retention rate in 2014 for clients with more than

$250,000 in assets rose from 96.2% in 2013 to 96.7% in 2014.  Discovery will show the hedge

position allegedly created by UFI or Ms. Fernandez never existed.

103.    TD Ameritrade has been through situations like what happened with UFI and RIA/RP

Fernandez before- a rogue IA/introducing BD or rogue RIA/RP continues to manage on a

discretionary basis accounts that are moved over to TD Ameritrade Retail after an independent

IA/introducing BD gets kicked off the TD Ameritrade Institutional platform and frozen out from

the IA's/BD's customers' accounts.  TD Ameritrade knew or should have known RIAs/RPs that

circumvent being frozen out of TD Ameritrade Institutional's and/or TD Ameritrade Retail's

platforms, respectively, tell their customers multiple lies in order to maintain their trust to

continue managing their accounts because, like inveterate gamblers, they believe the next roll of

the dice or daily leveraged ETF trade will turn things around once and for all.

### JNUG and NUGT Were Ruinously Unsuitable for UFI/TD Ameritrade Customers

104.    Another wildly unsuitable security RIA/RP Fernandez took large positions in Mrs.

Antczak's TD Ameritrade Institutional and TD Ameritrade Retail brokerage accounts had a

ticker of "JNUG."  A Summary Prospectus issued by Direxion Daily Junior Gold Miners Bull

3X Shares dated February 28, 2014 (the "JNUG Feb. 28, 2014 Summary Prospectus") states:

"The Direxion Daily Junior Gold Miners Bull 3X Shares ('Fund') seeks *daily* leveraged

investment results. The pursuit of daily leveraged goals means that the Fund is riskier than

alternatives that do not use leverage because the Fund's objective is to magnify the performance

of an index."

105.    The JNUG Feb. 28, 2014 Summary Prospectus also states;

>  The Fund seeks daily investment results, before fees and expenses, of 300% of the
>  performance of the Market Vectors™ Junior Gold Miners Index. The Index is composed
>  of equity securities of issuers involved in the exploration and production ['E&P'] of gold
>  and does not track changes in the spot price of gold as a commodity. ***The Fund seeks
>  daily leveraged investment results and does not seek to achieve its stated investment
>  objective over a period of time greater than one day.*** The Fund is much different and
>  much riskier than most exchange-traded funds.

*See* JNUG Feb. 28, 2014 Summary Prospectus, p. 1 (emphasis in original).  It further states;

"**The Fund is designed to be utilized only by knowledgeable investors who understand the**

**potential consequences of seeking daily leveraged investment results, understand the risks**

**associated with the use of leverage and are willing to monitor their portfolio's frequently.**"

*See id.* (emphasis in original).

106.    The "JNUG fact sheet" explains under "Target Index" that:

>  The MVIS Global Junior Gold Miners Index (MVGDXJTR) tracks the performance of
>  foreign and domestic micro-, small- and mid-capitalization companies that generate, or
>  demonstrate the potential to generate, at least 50% of their revenues from, or have at least
>  50% of their assets related to, gold mining and/or silver mining, hold real property or
>  have mining projects that have the potential to produce at least 50% of the company's
>  revenue from gold or silver mining when developed, or primarily invest in gold or silver.
>  One cannot directly invest in an index.

107.    The Summary Prospectus for JNUG dated February 28, 2017 (the "JNUG Feb. 28, 2017

Summary Prospectus") is available on Direxion's website (and contains information and statistics

similar to the 2014 version).  On page 3 of the JNUG Feb. 28, 2017 Summary Prospectus is a

chart no UFI Customer would understand, and Ms. Fernandez chose to ignore.  The JNUG Feb.

28, 2017 Summary Prospectus states the MVIS Global Junior Gold Miners Index's; "annualized

historical volatility rate for the five year period ended December is 41.98%" but notes; "volatility

for a shorter period of time may have been substantially higher." Direxion provides this useless information to mask the true, higher volatility the MVIS Global Junior Gold Miners Index manifests when not "smoothed" by taking an average over a five (5) year period (and fails to disclose that a purchaser of JNUG will experience volatility in excess of the Index's volatility by holding onto a position in JNUG for more than a day).

108.    JNUG is designed to provide daily leveraged returns based upon the Market Vectors™ Junior Gold Miners Index by utilizing: future contracts; options on securities; indices and futures contracts; equity caps; floors and collars; swap agreements; forward contracts; short positions; reverse repurchase agreements; ETFs; and other financial instruments (NUGT also purchases similar instruments). *See* JNUG Feb. 28, 2014 Summary Prospectus, p. 2. The use of these highly speculative investments in an attempt to mimic by 300% the return the Market Vectors™ Junior Gold Miners Index adds several orders of magnitude to the volatility of JNUG and NUGT beyond the volatility associated with the indexes they purport to seek to mimic on a 300% bull basis. Purchasing exotic financial instruments like JNUG and NUGT do also causes these ETFs to have high net expense ratios- over 1%- which is 20-40 times the expense ratio of any ETF that would actually be suitable for Mrs. Antczak.

109.    Even if one conservatively assumes a volatility rate of 41.98% for the Market Vectors™ Junior Gold Miners Index and what that level of volatility, hypothetically, does to the return an investor could expect from buying JNUG, the chart in the JNUG prospectus shows at that volatility rate no rational investor nor licensed professional advisor would buy either of these daily leveraged 300% ETF's unless they thought the Market Vectors™ Junior Gold Miners Index was going to rise by more than 40%. Again, the price of gold was declining the entire time UFI was on TD Ameritrade Institutional's platform. Moreover, the JNUG ETF only came into

existence in October of 2013 so it had little track record to review before RIA Fernandez started buying it in the accounts of UFI customers.  The parties in this litigation know the due diligence files a RIA/RP is expected to put together before investing a client's money into securities like JNUG and NUGT and the other securities purchased following this destructive strategy are going to be rather sparse at UFI- if they exist at all.

## Ms. Fernandez Resumes the Wildly Unsuitable Trading Strategy in Former UFI Customer Accounts on TD Ameritrade Retail's Platform

110.    On June 3, 2014, Ms. Fernandez bought a put option on NUGT in Mrs. Antczak's x937 account and a put option on NUGT and JNUG in Mrs. Antczak's x917 account- red flags evidencing Mrs. Antczak was back in the grip of Ms. Fernandez.   On June 24, 2014 Ms. Fernandez sold out the entire 2,400 share NUGT position in the x937 account at a price of $45.32 incurring a huge loss since the average purchase price of these daily leveraged 300% ETF shares had been over $90 per share.  Then Ms. Fernandez crazily took another large position in her other favorite daily leveraged 300% ETF- a 2,000 share position in JNUG on June 30, 2014. In short, after losing another $100,000 on selling out wildly unsuitable NUGT, Ms. Fernandez bought almost $50,000 worth of wildly unsuitable JNUG in the same account a week later.  Ms. Fernandez kept buying shares of JNUG in June and July of 2014 and options on these ETFs in Mrs. Antczak's brokerage accounts.

111.    Despite having purchased NUGT at an average cost of $94.32 in the x917 account, on July 29, 2014 Ms. Fernandez sold 1,000 shares of NUGT at $28.01 per share (total loss was about $60,000) only to then buy 1,000 shares of NUGT on August 5th which she sold the next day making about $2,600 in profit (i.e., about $2.60 per share).  Again, Ms. Fernandez in her personal capacity took a loss of about $60 a share on NUGT in order to free up some cash in

Mrs. Antczak's TD Ameritrade Retail brokerage accounts to be able to day trade the same number of shares of NUGT on August 5th and make $2.60 a share. This insane pattern was also going on in the x937 account in August of 2014.

112.    In September of 2014, things got really ugly. Ms. Fernandez continued to take large positions in JNUG while attempting to day trade it. Mrs. Antczak saw her portfolio at TD Ameritrade Retail fall in value from about $400,000 to $250,000 as JNUG closed at $11.82 a share on September 30, 2014 after Ms. Fernandez bought 2,000 shares at $21.50 on September 4, 2014 and another 2,000 shares the same day at $20 a share and a call option on September 12th.

113.    Mrs. Antczak's TD Ameritrade Retail accounts fell another $100,000 in value in October of 2014 as the 5,000 shares of JNUG closed at $3.94 a share at month's end. Ms. Fernandez "doubled down" by buying more shares of JNUG using margin debt to accomplish it in October and November of 2014 such that the x937 account had 7,000 shares of JNUG in it by the end of November of 2014.

114.    Also in October of 2014, the 900 shares of wildly unsuitable Proshares Ultra Silver (ticker "AGQ") which had been purchased at an average price of $72.61 in the x937 account, closed on October 31, 2014 at $41.06 per share. ProShares Ultra Silver is another leveraged ETF that seeks daily investment results, before fees and expenses, that correspond to two times (200%) the daily performance of silver bullion as measured by the U.S. Dollar price for delivery in London. According to the ProShares Ultra Silver Fact Sheet dated March 31, 2017, the London Silver Price Fund since its inception has returned 7.47% to investors whereas AGQ, a security seeking to achieve twice the return of the London Silver Price, has returned -2.29%. Similarly, the ProShares Ultra Silver total return for the last 5 years on the Fact Sheet is -28.32% while the London silver price has only declined 11.04% over the same 5 years.

115.    By the end of November of 2014, the 3 wildly unsuitable positions in the x917 account, NUGT, JNUG and GGN were worth $84,000 with unrealized losses of $280,000 for these positions.  Yet Ms. Fernandez kept buying thousands of dollars more of JNUG and NUGT in the account even as JNUG traded in the $3-$4 per share range.  On December 18, 2014, there was a 10 for 1 reverse split causing Mrs. Antczak's 7,000 share position in JNUG to now be only 700 shares.  Mrs. Antczak's 2014 Annual Brokerage Statement Summary showed an unrealized loss of over $210,000 on the 3,574 shares of NUGT she owned.

116.    According to BrokerCheck on FINRA's website, the Prior Complaint was settled sometime before December 11, 2014 (this date is the date listed as when the last update on the Prior Complaint was provided); the Prior Complaint settled for $260,000.  Thus this is the latest date by which TD Ameritrade would have known there was serious merit to the allegations made in the Prior Complaint.

117.    Ms. Fernandez was buying and selling call and put options in the x917 account in January, February (she also ended both months with a margin debt of $30,000+) and March of 2015 and sold the last suitable and only fixed income investment in the x917 account on March 11, 2015.  Ms. Fernandez laid low for the months of April, May and June of 2015 as these wildly unsuitable investments were very much underwater and TD Ameritrade had sent out the Fernandez Removal Letters.  Mrs. Antczak's July 2015 brokerage statement for the x917 account showed her portfolio in there was now valued at about $40,000 as NUGT was selling at $3.14.  Ms. Fernandez netted a few hundred dollars in profit here and there during the summer of 2015 on trades in Mrs. Antczak's accounts.

**Rather Than Contact a Regulator, TD Ameritrade Attempts to Supplant Ms. Fernandez With One of Its Own RIAs**

118.    TD Ameritrade was aware Ms. Fernandez was still executing trades in the TD Ameritrade Retail accounts of former UFI customers on a discretionary basis during the summer of 2015 even after it had; 1) its risk/compliance management team send out the Fernandez Removal Letters, 2) required former UFI customers so affected to change their log-in information one or more times, and 3) given Ms. Fernandez a verbal scolding that she better comply with her second freeze-out from TD Ameritrade.   However, TD Ameritrade still elected not to inform any regulator about Ms. Fernandez's continuation of the same wildly unsuitable trading strategy for customers she once served equally irresponsibly as RIA or her recidivist circumvention of each freeze-out from the various TD Ameritrade platforms.

119.    Since informing a regulator was "off the table" due to the blowback it could bring TD Ameritrade's way, TD Ameritrade decided its next meek attempt at stopping the death spiral trading strategy Ms. Fernandez was now continuing in her personal capacity would be to try to win over Ms. Fernandez's "advisory" business with former UFI customers for its family of companies.   This supplant-Ms.-Fernandez-with-one-of-our-own strategy was executed by; 1) providing the names of these former UFI customers now on TD Ameritrade Retail's platform who were still in the grip of Ms. Fernandez to RIAs working for TD Advisory, 2) informing these TD Advisory RIAs about Ms. Fernandez and her wildly unsuitable strategy and investment choices that were causing massive losses in these self-directed accounts, and 3) having these TD Advisory RIAs repeatedly call persons in the predicament Mrs. Antczak was in to try to win over the IA business opportunity for TD Ameritrade (while deceiving former UFI customers about the facts alleged herein).

120.    At some point during the summer of 2015, TD Advisory's RIA Dominic Galati mailed or otherwise provided Mrs. Antczak a slick TD Ameritrade folder with copies of Mrs. Antczak's

brokerage account statements for May of 2014 and May of 2015 for her two TD Ameritrade Retail accounts.  RIA Galati put a yellow Post-it Note on the May 2014 brokerage statements labeling them as "May 2014."  RIA Galati put a yellow Post-it Note on the May 2015 statements labeling them as "May 2015."  Also on the May 2015 Post-it Note, he wrote; "Please call me- this needs to be addressed" (emphasis in original).  RIA Galati's business card was included in the space for them on the inside of the folder.  His title was Investment Consultant.

121.    According to BrokerCheck, since September of 2013 Dominic Galati (CRD #5854687) is dually registered as a registered investment advisor employed by TD Ameritrade Investment Management, LLC and as a RP employed by TD Ameritrade who is located at TD Advisory's offices in Marlton, New Jersey (which is near Mrs. Antczak's home in Cinnaminson).

122.    RIA Galati and the other TD Advisory RIAs who were to carry out this assignment were instructed not to say anything more than what can be found in the April 17th Termination Letters or the Fernandez Removal Letters about UFI, RIA/RP Fernandez and/or Ms. Fernandez as an individual to these former UFI customers.  The TD Advisory RIAs were not permitted to inform former UFI customers that TD Ameritrade, TD Clearing, UFI, RIA/RP Fernandez and Ms. Fernandez as an individual had been in breach of their respective fiduciary duties since the beginning of 2013.

123.    By providing Mrs. Antczak the slick folder containing brokerage statements that were one year apart, RIA Galati sought to highlight that between the end of May, 2014 and the end of May, 2015, Mrs. Antczak's x937 account had lost almost half its value and the x917 account had lost just over half its value.  By the end of May, 2015, Mrs. Antczak's two TD Ameritrade Retail accounts had a combined portfolio value of about $145,000 and over $400,000 in unrealized

losses in JNUG, AGQ, NUGT and GGN.  The x937 account only had shares of JNUG and AGQ in it- positions that had been purchased in 2013 and 2014.

124.   Mrs. Antczak received many phone calls from RIA/RP Galati and eventually went in to visit him at his office in Marlton.  RIA Galati told her Ms. Fernandez was no longer affiliated with TD Ameritrade and Mrs. Antczak had to pick a new TD Ameritrade RIA.  RIA Galati was unsuccessful- Mrs. Antczak decided to remain with Ms. Fernandez having discretion to trade in her accounts on TD Ameritrade Retail's platform even though such an arrangement was not permitted by TD Ameritrade.  TD Advisory had failed to eradicate Ms. Fernandez with a hard, deceptive sales pitch by one of its RIAs.

125.   During his sales calls, RIA/RP Galati was not allowed by TD Ameritrade/TD Advisory to tell Mrs. Antczak she needed to contact a regulator about UFI and Ms. Fernandez in her personal capacity despite that being the only way to stop the bleeding (because no one at TD Ameritrade or TD Advisory was allowed to contact a regulator).  RIA/RP Galati was not allowed by TD Advisory/TD Ameritrade to tell Mrs. Antczak she needed to hire a lawyer and sue the parties named herein.  Mrs. Antczak still believed Ms. Fernandez or UFI had set up a hedge when RIA/RP Fernandez began over-concentrating UFI customers in NUGT and JNUG back in 2013 and would only bail out Mrs. Antczak (and other former UFI customers) from her heavy losses if she retained Ms. Fernandez to serve as her "advisor" "managing" Mrs. Antczak's TD Ameritrade Retail brokerage accounts.

126.   Over August 19th-20th of 2015, the financial nightmare brewing over a number of years in Mrs. Antczak's TD Ameritrade accounts erupted as Ms. Fernandez realized about $285,000 in losses via 3 trades over these 2 days.  The selling of 2,574 shares of NUGT on August 20, 2015 resulted in a long-term loss of $222,000 and the selling of 1,000 shares of NUGT on the same

day resulted in a short-term loss of $10,500.  When Ms. Fernandez sold out this massive long-term NUGT position, NUGT was near its low in price for 2015 (to date).  Thus, incredibly, Ms. Fernandez bought and held one or more large positions in a daily leveraged 300% ETF- meant to be held for only a day- for over one year (in order for something to qualify as a long-term loss for federal tax purposes, the investment has to be held for more than a year).  Ms. Fernandez took a $54,000 short-term loss on a trade of 300 JNUG shares on August 19, 2015.  This JNUG position cost $57,515 to amass and Ms. Fernandez cashed it out for only $3,290 in this transaction.  When Ms. Fernandez sold out this JNUG position it was near its low in price for 2015 (to date).  Thus Ms. Fernandez had not waited for an upswing to sell both NUGT and JNUG.  Ms. Fernandez took the meager proceeds from these NUGT and JNUG trades and used them to buy unsuitable options on suitable investments (i.e., Chipotle Mexican Grille, Google, Inc.) in an attempt to throw TD Ameritrade off her trail for a few months because she knew TD Advisory was making sales calls on the customers of the accounts she was trading in.

127.    TD Ameritrade took no further attempt to intervene or stop Ms. Fernandez from continuing to buy more NUGT and JNUG in Mrs. Antczak's TD Ameritrade Retail accounts. Ms. Fernandez returned to buying options and positions in JNUG and NUGT and other wildly unsuitable securities.   In the box where it identifies "your representative" on all the trade confirmations, "TD Ameritrade" is typed in there for all of Mrs. Antczak's confirmations from 2015.

128.    October of 2015 would see Ms. Fernandez selling an AAPL position to make a couple hundred bucks in order to use the proceeds to buy more NUGT in one of Mrs. Antczak's accounts- a 1,000 more shares on October 28, 2015 after buying 1,000 shares of NUGT on October 6th; Mrs. Antczak's margin balance rose to $27,000 by the end of October 2015.

129.    Ms. Fernandez bought and sold a number of options, mostly in NUGT, but also in other wildly unsuitable investments in Mrs. Antczak's TD Ameritrade Retail accounts in October, November and December of 2015.  TD Ameritrade Retail knew whose calling card those option trades evidenced.  Ms. Fernandez bought small positions in suitable securities such as AAPL and Gilead Sciences Inc. (ticker "GILD")- thinking that buying a few suitable investments this late in the game- while still continuing to buy wildly unsuitable daily leveraged 300% ETFs would somehow throw off TD Ameritrade from noticing her purchases of NUGT in Mrs. Antczak's accounts.  By the end of December of 2015, Mrs. Antczak's two TD Ameritrade accounts were now down to a combined $110,000.  Mrs. Antczak received only $59 in ordinary dividends in 2015 and paid over $1,200 in margin interest according to tax documents TD Ameritrade provided her which evidences how badly her accounts were being mismanaged given that she is a retired senior citizen.

130.    On February 20, 2016, TD Ameritrade sent Mrs. Antczak a "do-not-reply" email informing her about a call option that had been purchased in one of her accounts (by Ms. Fernandez).  Mrs. Antczak sent an email to her "advisor," Ms. Fernandez, alerting Ms. Fernandez that TD Ameritrade had sent the email and that immediate action may be required.   Ms. Fernandez responded that same day letting Mrs. Antczak know Ms. Fernandez was expecting Mrs. Antczak to get such an email from TD Ameritrade and that there was nothing Mrs. Antczak needed to do.  Ms. Fernandez explained via email; "You get them [i.e., this type of email from TD Ameritrade Retail] every time I write a covered call against a position [in your brokerage account] and it gets called away."  In the same email Ms. Fernandez talked about having made money on the call option she recently bought on NUGT;

> It was a good trade. I changed my approach and will continue to do short-term trades like this. I want to send $20k to your bank account now that it is at $100k [i.e., the total value

of your account; the amount of cash in the account was approximately $22,000] in your individual account again. What do you think? I don't need to keep all of the cash in your account b/c I will continue to do short-term trades and always have cash available. As I grow to $100k again, I will send you another $20k. This way you can put money aside for whatever you want and continue to recover your losses.

Mrs. Antczak quickly responded and thanked Ms. Fernandez for getting back to her; Mrs. Antczak wrote that she would think about it and get back to Ms. Fernandez in a few days.

131.    Rather than wait for a response, two days after this email exchange, on February 22, 2016, Ms. Fernandez bought 10,000 shares of a daily leveraged 300% bear gold ETF- the daily Gold Miners IDX Bear 3x Shares (ticker "DUST")- in one of Mrs. Antczak's TD Ameritrade Retail accounts.  The first purchase of DUST on February 22, 2016 was done at $5.52 per share and by the time the last position was purchased that day DUST had already fallen to $5 per share.  On February 24, 2016, Ms. Fernandez bought another 10,000 shares of DUST at a price per share ranging between $4.34 and $4.41 so the total amount invested in DUST was over $74,000.  Ms. Fernandez used over $20,000 in margin in the x917 account to be able to effect these purchases.  At the end of February of 2016, the only security in the x937 account was DUST.

132.    On March 7, 2016, Ms. Fernandez bought another 10,000 shares of DUST in the two accounts at a price per share ranging between $3.375 and $3.3799 per share.  On or about April 29, 2016 DUST announced a reverse split would occur on May 18, 2016; every 10 shares of DUST held by investors would be replaced with just 1 share.  Knowing what a red flag a reverse split was that further volatility and price decreases for DUST were coming, Ms. Fernandez quickly sold out all 30,000 shares of DUST at a price around $1.34 per share.  The loss on the 20,000 shares in the x917 account was $64,400.32 and the loss in the x937 account was about half of that.  Thus Ms. Fernandez, again and with the full knowledge of TD Ameritrade, placed

over 99% of Mrs. Antczak's remaining money in just one security- DUST, an epic over-concentration, unsuitably used margin and bought and held the daily leveraged 300% bear gold ETF for several months.

133.    In May of 2016, Ms. Fernandez returned to buying NUGT in Mrs. Antczak's accounts. At the end of May of 2016, the only security in the x937 account was NUGT.  In July of 2016, Ms. Fernandez sold out all of the positions in securities she had created in Mrs. Antczak's TD Ameritrade Retail accounts (except for one with a value of $240).  Ms. Fernandez then put about 50% of the money in Mrs. Antczak's 2 TD Ameritrade Retail accounts into JNUG on July 28, 2016 and then sold out the positions for a profit on August 2nd.  Emboldened by this minor success, Ms. Fernandez then put over 99% of the money in Mrs. Antczak's 2 TD Ameritrade Retail accounts into JNUG on August 8, 2016.  On August 24, 2016 JNUG announced a stock split which provided investors 10 shares for every 1 share they held.  Normally a stock split is a good sign for a security, however, by month's end, the 4,000 shares of JNUG in Mrs. Antczak's 2 TD Ameritrade Retail accounts had lost almost half their value since being purchased.

134.    Due to 99% of the money in Mrs. Antczak's 2 TD Ameritrade Retail accounts being invested in JNUG, by the end of December of 2016, their combined value was about $27,000 with unrealized losses of over $90,000.  Thus Mrs. Antczak's 2 TD Ameritrade Retail accounts at year end 2016 had lost 96% of the money and securities Mrs. Antczak initially moved over to TD Ameritrade Institutional back around July of 2012.

135.    Ms. Fernandez was still providing constituent services normally provided by a RIA/RP in December of 2016 for former UFI customers with TD Ameritrade's full knowledge.  Ms. Fernandez filled out the paperwork Mrs. Antczak needed to file with TD Ameritrade in connection with taking the required minimum distribution ("RMD") from her IRA.  Ms.

Fernandez forwarded the completed paperwork to Mrs. Antczak via email in late December telling her where to sign on the RMD Form and that she then needed to fax it to TD Ameritrade.

### Ms. Fernandez in Her Personal Capacity Was Still an Advisor Under the Pennsylvania Securities Act of 1972

136.    A person is acting as an RIA under the Pennsylvania Securities Act of 1972, as amended, if:

> (i) Except as provided in paragraph (iii), with respect to any investment adviser registered or required to be registered under this act, any partner, officer, director or person occupying a similar status or performing similar functions, or other individuals employed by or associated with an investment adviser who performs any of the following:
>
>> (A) Makes any recommendations or otherwise renders advice regarding securities;
>> (B) Manages accounts or portfolios of clients;
>> (C) Determines which recommendation or advice regarding securities should be given;
>> (D) Provides investment advice or holds himself or herself out as providing investment advice;
>> (E) Supervises employes who perform any of the foregoing; or
>> (F) Receives compensation to solicit, offer, or negotiate for the sale of or for selling investment advice.

*See* Pennsylvania Securities Act of 1972, §102(j.1).

137.    After TD Ameritrade had frozen out UFI and RIA Fernandez from TD Ameritrade Institutional's platform for independent IAs and realized she was continuing to gamble away the money in the brokerage accounts of UFI customers who had been transferred to TD Ameritrade Retail, TD Ameritrade knew or should have known that by conducting discretionary trading in the TD Ameritrade Retail accounts of former UFI customers, under Pennsylvania law, Ms. Fernandez was acting as a RIA even though she no longer had her RIA license.  TD Ameritrade knew Ms. Fernandez's conduct included, at a minimum;

> a) making recommendations or otherwise rendered advice regarding securities;
> b) managing accounts or portfolios of persons;

c) determining which recommendation or advice regarding securities should be given; and

d) providing investment advice and holding herself out as providing investment advice.

138.    It unlawful for an advisor who has not registered or whose registration has been revoked, suspended, or denied to practice her trade under the Advisers Act; if she does so, she may be subject to criminal penalties or an injunction. *See* §§ 80b-17, 80b-9(e).  Section 80b-17 of the Advisers Act states; "Any person who willfully violates any provision of this subchapter, or any rule, regulation, or order promulgated by the Commission under authority thereof, shall, upon conviction, be fined not more than $10,000, imprisoned for not more than five years, or both."

The Advisers Act also makes it unlawful for advisers to engage in "fraudulent, deceptive, or manipulative" conduct. *See* § 80b-6.

139.    The Commonwealth of Pennsylvania would want to know that a RIA/RP previously registered by the Commonwealth and the SEC was acting as an unlicensed RIA in Pennsylvania as soon as each company in the TD Ameritrade family learned that fact.  Ms. Fernandez was registered with the SEC until February of 2012- surely the SEC would want to know what was going on in the accounts of former UFI customers/former UBS customers before the SEC's jurisdiction over RIA Fernandez expired.

140.    On or about August 11, 2011, TD Ameritrade entered into an AWC Letter with FINRA regarding TD Ameritrade's failure to provide customers a prospectus (or product description) when they initially purchased certain ETF funds.  According to the AWC Letter, there were 4,818,230 ETF sales over a 20 month period where TD Ameritrade failed to provide the ETFs' product description to the customer.  FINRA imposed a fine of $2,650,000 for these 4,818,230 failures.  The TD Ameritrade AWC Letter noted; "In assessing the sanctions in this matter, FINRA took into account the fact that, before FINRA staff commenced any examination into

ETF violations, the firm self-reported the ETF transactions and violations." TD Ameritrade was also lauded in the TD Ameritrade AWC Letter; "The firm [TD Ameritrade] informed FINRA of the specific Rule it believed it had violated, the approximate number of potentially violative transactions for 2009 and 2010, and it promptly provided extensive supporting information." At the time TD Ameritrade self reported this violation, FINRA had already opened an inquiry into whether TD Ameritrade was providing customers a prospectus at the time of certain mutual fund sales.

## VIOLATIONS COMPLAINED OF

FIRST CAUSE OF ACTION
BREACH OF FIDUCIARY DUTY
Against All Defendants

141.    Plaintiff incorporates herein paragraphs 1-140.

142.    UFI and RIA/RP Fernandez were licensed professionals with a fiduciary duty to only make trades that were in the best interests of UFI's customers. UFI's and RIA/RP Fernandez's fiduciary duty also required them to have performed due diligence and a suitability analysis before purchasing securities in the accounts of any of their customers. UFI and RIA/RP Fernandez had discretion to freely trade in most, if not all, of the TD Ameritrade Institutional brokerage accounts of UFI customers. UFI and RIA/RP Fernandez abused the discretion granted to them and breached their fiduciary duty to UFI customers as described herein.

143.    Once UFI was no longer licensed or functioning, Ms. Fernandez in her individual capacity created or developed a fiduciary duty to Plaintiff. Fiduciaries have a duty to make full and fair disclosures of all material facts and employ reasonable care to not mislead clients. Ms. Fernandez in her individual capacity violated this fiduciary duty by deceiving Mrs. Antczak into believing: 1) Ms. Fernandez was still a licensed securities professional when she was not, 2) Ms.

Fernandez was the only advisor who would know when to sell the heavy over-concentrations of NUGT and JNUG in Mrs. Antczak TD Ameritrade brokerage accounts to best get her out of the mess UFI created, 3) prior to or during over-concentrating most, if not all, UFI accounts in daily leveraged 300% ETFs JNUG and NUGT, UFI or Ms. Fernandez in her individual capacity had hedged that investment strategy, and 4) if forced to cash out that purported hedge position because JNUG and NUGT performed poorly, UFI or Ms. Fernandez herself, would use the proceeds to share in the losses of only those former UFI customers who allowed Ms. Fernandez to continue having discretion to trade in their TD Ameritrade Retail brokerage accounts by using their personal log-in information.

144.    Clearing firms are only liable for the investment strategy of an introducing BD/IA if they directly knew about how insane the investment strategy was and the losses it was inflicting and did nothing of consequence.  TD Ameritrade and TD Clearing knew from their exception reports since sometime in early 2013 that UFI was following, on a discretionary basis, an investment strategy that assured a financial death spiral to the brokerage assets of UFI customers.  TD Ameritrade and TD Clearing failed to meaningfully intercede due to the blowback TD Ameritrade and TD Clearing could expect if they were to follow through with their regulatory obligations and contact a regulator about UFI.

145.    The TD Ameritrade AWC Letter demonstrates TD Ameritrade knows of its obligation to self report violations it uncovers.  However, the TD Ameritrade AWC Letter also evidences TD Ameritrade only self reports minor infractions and not until FINRA is already on site looking into a related issue.  TD Ameritrade also knows it must inform FINRA if it conducts an internal investigation which surely it did regarding UFI and Ms. Fernandez in her personal capacity. Rather than report the results of its internal investigation regarding UFI and/or Ms. Fernandez in

her personal capacity, TD Ameritrade elected to put in place a conspiracy of silence such that no member of the TD Ameritrade family of companies was permitted to contact FINRA or any other regulator.  This decision by the TD Ameritrade family of companies was to protect the TD Ameritrade Defendants which sadly, knowingly, sacrificed the savings of UFI customers and later, former UFI customers.

146.    The TD Ameritrade Defendants are and were all licensed and, at various times based upon their knowledge, complicity and directly deceptive actions, created or developed a fiduciary duty with Mrs. Antczak.  The TD Ameritrade Defendants, for example, permitted UFI and then Ms. Fernandez in her individual capacity to heavily over-concentrate TD Ameritrade brokerage accounts for conservative or income investors like Mrs. Antczak in daily leveraged ETFs which set off numerous red flags on TD Ameritrade and TD Clearing exception reports that were ignored or not followed up on in any meaningful way.

147.    The April 17th Termination Letters and Fernandez Removal Letters TD Ameritrade were intended to deceive UFI customers and former UFI customers, respectively, and allowed Mrs. Antczak and the rest of these TD Ameritrade Retail customers to continue to lose a lot of money they now seek.  Each time TD Ameritrade and TD Clearing cleared a daily leveraged ETF trade they knew had been ordered by Ms. Fernandez logging into and trading in TD Ameritrade Retail brokerage accounts of former UFI customers represented a *per se* breach of TD Ameritrade's and TD Clearing's fiduciary duty.  Each time TD Ameritrade figured out Ms. Fernandez was logging into and trading in TD Ameritrade Retail brokerage accounts using the personal log-in information of former UFI customers and chose not to inform a regulator represented a *per se* breach of TD Ameritrade's and TD Clearing's fiduciary duties.  The TD Ameritrade Defendants

sacrificed Mrs. Antczak's life savings in order to avoid regulatory scrutiny and the possibility of having to pay restitution to possibly thousands of customers and a fine.

148.    TD Ameritrade and TD Clearing knew of and permitted Ms. Fernandez to trade in Mrs. Antczak's TD Ameritrade Retail accounts such as accumulating in the x937 account only daily leveraged 300% bear gold ETF "DUST" in February of 2016 even though Ms. Fernandez had been "frozen out" of TD Ameritrade brokerage accounts at least twice.  TD Clearing cleared these trades in the TD Ameritrade brokerage accounts of Mrs. Antczak with full knowledge that Ms. Fernandez was doing the trading on a discretionary basis and still serving as an "advisor" when, for example, Ms. Fernandez bought 10,000 shares of DUST in late February of 2016. Mrs. Antczak placed a special trust, confidence, and reliance on Ms. Fernandez in her personal capacity to exercise her discretion and expertise in Mrs. Antczak's TD Ameritrade Retail brokerage accounts and Ms. Fernandez knowingly accepted that trust and confidence to exercise her purported expertise and discretion to act on the client's behalf and all of this occurred and continued with the full knowledge of the TD Ameritrade Defendants.

149.    TD Ameritrade and TD Clearing were aware Defendants UFI and Defendant Ms. Fernandez in her individual capacity used discretionary authority to purchase in customers' brokerage accounts daily leveraged ETFs even though those purchases were not in their respective best interests.  TD Ameritrade and TD Clearing knew or should have known RIA/RP Fernandez was selling out suitable positions often at a loss in order to buy more daily leveraged ETFs in UFI brokerage accounts.  All Defendants knew buying daily leveraged ETFs in Mrs. Antczak's accounts was patently unsuitable.   These acts constitute willful breaches of the fiduciary duty each TD Ameritrade Defendant owed to Mrs. Antczak once each TD Ameritrade Defendant became apprised that another introducing BD/IA had to be frozen out of its accounts

for wildly unsuitable trading/breach of fiduciary duty but the customers were not going to be informed of this or any facts which might aid them as to what to do as a result.

150.    Knowing the account came to TD Ameritrade Retail because it had been the account of an independent IA/introducing BD that had been frozen out of its accounts on the TD Ameritrade Institutional platform, the paperwork TD Ameritrade accepted at each juncture when TD Ameritrade granted option buying and margin use in Mrs. Antczak's accounts should have been closely scrutinized and denied!  TD Ameritrade never required UFI and later, Ms. Fernandez in her personal capacity, to produce an over-concentration consent form signed by the customers whose accounts she was exercising discretion in acknowledging the extreme risk presented by over-concentrations in extremely risky securities like JNUG and NUGT.

151.    The TD Ameritrade Defendants all know retail investors whose money is invested primarily in daily leveraged 300% ETFs in a buy-and-hold strategy face the very real possibility of losing most or all of the principal invested.  The TD Ameritrade Defendants allowed UFI and the Ms. Fernandez in her individual capacity to circumvent TD Ameritrade's meager protections put in place to stop this from happening once the conduct started showing up on exception reports- at the latest in early 2013.  Mrs. Antczak's lack of investment experience was taken advantage of when JNUG and NUGT were bought in her accounts.

152.    A fiduciary duty standard applies to judging Defendants because all will be shown to have taken evasive actions to avoid regulators in connection with the buying and selling of securities.  Defendants will be shown to have violated their WSPs, the Advisers Act, any applicable code of ethics and the securities laws while breaching their fiduciary duties to Mrs. Antczak by recommending and buying primarily JNUG and NUGT (or having permitted UFI

and Ms. Fernandez to recommend and buy JNUG and NUGT) in her accounts and then deceiving her about what was going on.

153.    Had any Defendant informed a regulator UFI's clearing agreement was being terminated "for cause," an investigation and/or regulatory inquiry would have been launched by one or more regulators which would have quickly uncovered RIA Fernandez's wildly unsuitable choice of investments and trading strategies in the accounts of UFI customers.  Had that happened back in 2013, RIA Fernandez most likely would have been barred from both the BD and IA industries and Plaintiff and all other UFI customers would have been spared most of the losses now sought as damages herein.  Despite its obligation to do so, TD Ameritrade did not want to run to a regulator with what it knew because it was concerned about the blowback on TD Ameritrade and TD Clearing.  For one thing, regulators would want to know why: 1) TD Ameritrade continued to do business with UFI when, for example, UFI had not produced a Form ADV after the initial one and was missing other key documents or information since its inception; 2) UFI's clearing agreement was not terminated "for cause" in writing and 3) TD Ameritrade waited until April 17, 2014 to freeze UFI and RIA/RP Fernandez out of UFI customers' accounts.  TD Ameritrade wrote the April 17th Termination Letter and then stuck its head in the sand hoping this problem would somehow go away on its own.  Instead, as has happened under the same scenario with other rogue IAs, the problem came back on another of its platforms and got even worse.

154.    At some point in time during the financial death spiral UFI customers experienced created by RIA/RP Fernandez's wildly unsuitable investment strategy utilizing wildly unsuitable investments, each Defendant had a fiduciary duty and, at times, overlapping fiduciary duties to Plaintiff to put her interests before; theirs, those of one of their sister companies, and/or Ms. Fernandez's future career trajectory in the financial services industry.  When that duty fell to

each Defendant herein, each Defendant chose to look out for themselves or conspired with other Defendants to serve their best interests rather than Mrs. Antczak's and UFI customers and later, former UFI customers.

155.    Mrs. Antczak lost hundreds of thousands of dollars- virtually all of her retirement savings- while Defendants, by taking evasive action, lost practically nothing.  No Defendant had to pay fines or pay restitution because they chose to conceal each others' wrongdoings from regulators and other parties who could have taken action to put a stop to what happened to Mrs. Antczak or at least sought to recoup some or all of her losses from Defendants' violations of the securities laws.  By hiding their knowledge of the problems detailed herein, the TD Ameritrade Defendants have not had to pay, for example, to hire independent compliance consultants to revise their WSPs regarding daily leveraged ETFs sales and holding periods, add exception reports, or prepare a report after investigating why TD Ameritrade failed to carry out its WSPs regarding daily leveraged ETFs and submit it to regulators as reports from all internal investigations must be turned over.

SECOND CAUSE OF ACTION
NEGLIGENCE
Against Defendants TD Clearing and TD Ameritrade

156.    Plaintiff incorporates herein paragraphs 1-155.

157.    TD Ameritrade and TD Clearing were tasked with supervising the conduct of the introducing BDs/IAs on TD Ameritrade Institutional's platform.  Clearing firms are required to create and review exception reports on the trades they are clearing for introducing BDs/IAs and check that they are following the securities laws and the clearing agreement.  If the introducing BD/IA is out of compliance, TD Ameritrade and TD Clearing need to confront the BD/IA about

the questionable transactions and, if unacceptable answers are given, terminate the BD/IA for cause and alert a regulator about that fact.

158.   TD Ameritrade and TD Clearing willfully, or at least negligently, failed in carrying out their duties to monitor and/or supervise UFI.  The TD Ameritrade Defendants willfully, or at least negligently, failed to report any of RIA/RR Fernandez's trading practices to a regulator.  TD Ameritrade and TD Clearing willfully, or at least negligently, violated their respective WSPs, the Advisers Act, any applicable code of ethics and the securities laws by ignoring or too meekly responding to the numerous red flags raised on their exception reports regarding the trading practices of UFI and later, Ms. Fernandez in her personal capacity.


THIRD CAUSE OF ACTION
BREACH OF CONTRACT
Against Defendants UFI, TD Ameritrade and TD Clearing

159.   Plaintiff incorporates herein paragraphs 1-158.

160.   When TD Ameritrade or TD Clearing removed $1,009 of cash from Mrs. Antczak's account on April 15, 2014, that was the AUM wrap fee to cover the period of April 1, 2014 through June 30, 2014 (90 days) that UFI was to serve as Plaintiff's IA under Mrs. Antczak's UFI Advisory Contract.  However, UFI was frozen out by TD Ameritrade Institutional or TD Clearing from serving as the IA of UFI's customers' accounts on April 17th so UFI could have only earned 16 days or 17 days worth of that $1,009 (about 18%).  The $1,009 (or $830 of it) was never returned by any of the Defendants to Mrs. Antczak.

161.   UFI breached the UFI Advisory Contract with Mrs. Antczak and all other UFI customers; they are entitled to have any AUM fees returned, on a *pro rata* basis representing the unearned portion, once their introducing BD/IA was frozen out of the TD Ameritrade Institutional

platform.  Indeed, TD Ameritrade and TD Clearing knew at the time the $1,009 AUM fee was removed for UFI on April 15, 2014 that UFI would never serve out its advisor role to Mrs. Antczak for the second calendar quarter for 2014.  As such, UFI breached the UFI Advisory Contract with the aid of TD Ameritrade and TD Clearing and Defendants UFI, TD Ameritrade and/or TD Clearing, jointly and severally, are required to return, in the instance of Mrs. Antczak, $830 of the fee she paid on April 15, 2014.  In another act of indifference to Mrs. Antczak's plight, TD Ameritrade did not seek to recover the $1,009 (or at least $830 of it) from UFI after freezing it out.

FOURTH CAUSE OF ACTION
CONVERSION
Against Defendants UFI, TD Ameritrade and TD Clearing

162.    Plaintiff incorporates herein paragraphs 1-161.

163.    TD Ameritrade Institutional or TD Clearing withdrew the $1,009 from Mrs. Antczak's account on April 15, 2014 and issued the April 17th Termination Letter stating April 17, 2014 was the last day TD Ameritrade Institutional and TD Clearing would honor any instructions from UFI.  TD Ameritrade Institutional and/or TD Clearing took $1,009 from Mrs. Antczak's account purportedly to pay UFI for serving as an IA for the period of April 1, 2014 through June 30, 2014.  UFI only provided 16 days of service and therefore Plaintiff was entitled to a *pro rata* refund of the fee collected for the calendar quarter.

164.    TD Ameritrade Institutional and/or TD Clearing never actually forwarded on the $1,009 to UFI or Ms. Fernandez.  Plaintiff has a right to possess the *pro rata* amount of $1,009 ($830) which was and is her money because the services it was to pay for were never provided her but

Mrs. Antczak does not know which Defendant out of TD Ameritrade, TD Clearing and UFI actually possesses some or all of the $830 that is rightfully hers.

165.     Regardless of which of these 3 Defendants possesses Mrs. Antczak's $830, Defendants TD Ameritrade, TD Clearing or UFI converted her money by a wrongful act that was inconsistent with the property right of Plaintiff to her cash in her TD Ameritrade brokerage account.  Mrs. Antczak's $830 was and is unreasonably being withheld from the one who has the right to possess it since April of 2014.  One or more of these 3 Defendants intentionally used Mrs. Antczak's $830 in their business without authority, contractual or otherwise, to use it.

FIFTH CAUSE OF ACTION
VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5
<u>Against All Defendants</u>

166.     Plaintiff incorporates herein paragraphs 1-165.

167.     Defendants' senior managers engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and other victims of rogue introducing BDs/IAs.  All Defendants made various untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities, primarily daily leveraged ETFs, which violated Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

168.     Such scheme was intended to and did: (i) deceive TD Ameritrade brokerage customers as alleged herein to keep them from moving their brokerage accounts from TD Ameritrade; (ii)

ensure regulators did not find out TD Ameritrade and TD Clearing allow rogue introducing BDs/IAs to essentially gamble away, oftentimes, the life savings of their conservative customers while TD Ameritrade and TD Clearing willfully ignore or respond too meekly to a plethora of red flags for months, if not years, before freezing the rogue BD/IA out from their customers' accounts but only reporting the clearing firm agreement termination as being "without cause;" (iii) permit a rogue introducing BD/IA to pretend as if it is still a functioning introducing BD/IA to its customers when it was not which led them to believe Ms. Fernandez could migrate with them over to TD Ameritrade Retail's platform; and (iv) allow one or more RRs, RPs or RIAs of said frozen-out rogue introducing BD/IA to then migrate over to the TD Ameritrade Retail platform from the TD Ameritrade Institutional platform by deceiving former customers into giving her their personal log-in information to continue the same ruinously unsuitable trading pattern that got their BD/IA frozen out in the first place.  TD Ameritrade, TD Clearing and TD Advisor were aware Ms. Fernandez was still serving as "advisor" after losing her licenses but still allowed her to openly and notoriously over-concentrate TD Ameritrade Retail brokerage accounts at late as the fall of 2016 in daily leveraged 300% ETFs even though TD Ameritrade, according to the Fernandez Removal Letters, does not allow any sort of "advisor," even legal RIAs, to run their IA businesses using accounts located on TD Ameritrade Retail's platform.

169.    All Defendants knew the use of margin and the purchase of options added unacceptable risk to UFI's purported investment strategy on top of the extremely risky securities UFI, and later, Ms. Fernandez was purchasing.  Even if an option is purchased as a hedge to over-concentrating in daily leveraged 300% ETFs, it still adds unsuitable risk because it means the ETF position is a dangerous buy-and-hold over-concentration,

170.    The TD Ameritrade Defendants knew failing to contact a regulator about persons like Ms. Fernandez and IAs/BDs like UFI would cause economic harm to customers.  The April 17th Termination Letters and Fernandez Removal Letters were meant to deceive when they needed to instead alert investors to immediately contact a regulator or attorney because TD Ameritrade would not be calling anybody.  The Fernandez Removal Letters falsely, repeatedly, identified Bridget Fernandez as an "advisor" when TD Ameritrade knew she was no longer licensed. These deceptions and schemes caused UFI customers to lose millions of dollars via notorious breaches of fiduciary duty by companies like UFI trading on a discretionary basis in TD Ameritrade Institutional accounts and caused former UFI customers to lose millions of dollars by then permitting rogue former RIAs/RPs to notoriously trade on a discretionary basis in TD Ameritrade Retail accounts using customers' log-in information.

171.    Pursuant to the above plan, scheme, conspiracy and course of conduct, the TD Ameritrade Defendants' senior managers participated directly or indirectly in the preparation and/or issuance of the April 17th Termination Letters and Fernandez Removal Letters, clearing firm control reports, and other statements and documents described above, including statements made to and facts omitted from the SEC or FINRA regarding UFI's termination being without cause and other statements and documents that were materially false and misleading in that they failed to disclose the knowledge of and facilitation by the TD Ameritrade Defendants of the investment strategy UFI and RIA/RP Fernandez, and later Ms. Fernandez in her personal capacity, carried out that created such large losses for UFI customers.

172.    Section 10(b) of the Exchange Act and Rule 10b-5 apply to the TD Ameritrade Defendants in the instant action because all the damages were due to the wildly unsuitable investment strategies being pursued and wildly unsuitable investments being purchased in TD

Ameritrade Institutional and TD Ameritrade Retail brokerage accounts and thus the events

described herein are all "in connection with the purchase or sale of [a] security."

173.   The TD Ameritrade Defendants' senior managers engaged in a plan, scheme, conspiracy,

and course of conduct, pursuant to which they knowingly or recklessly engaged in acts,

transactions, practices, and courses of business which operated as a fraud and deceit because no

one in the TD Ameritrade family of companies was permitted to contact a regulator about UFI,

RIA/RP Fernandez or Ms. Fernandez in her personal capacity.  Said acts and omissions of the

TD Ameritrade Defendants' senior managers were committed knowingly, willfully or with

reckless disregard to the financial consequences suffered by UFI customers and, later on, former

UFI customers while TD Ameritrade conspired to ensure no one in the TD Ameritrade family of

companies told a regulator about the allegations herein.

174.   The TD Ameritrade Defendants' RIAs, RRs and RPs engaged in a plan, scheme,

conspiracy, and course of conduct, pursuant to which they knowingly, willfully engaged in acts,

transactions, practices, and courses of business which operated as a fraud and deceit because no

one in the TD Ameritrade family of companies was permitted to advise a TD Ameritrade

Institutional or TD Ameritrade Retail customer orally or in writing that they needed to contact an

attorney or a regulator regarding what had been going on in their TD Ameritrade brokerage

accounts when, for example, the introducing BD's/IA's access to its customer accounts was taken

away by TD Ameritrade (a serious red flag incident).  No one in the TD Ameritrade family of

companies was permitted to advise a customer of TD Ameritrade Institutional or TD Ameritrade

Retail that the person "managing" their TD Ameritrade brokerage account and TD Ameritrade

and TD Clearing were in breach of their respective fiduciary duties to them since sometime in

early 2013.  TD Ameritrade's and TD Clearing's senior managers engaged in a plan, scheme,

conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit because TD Ameritrade Institutional represented to regulators, UFI customers, and others that UFI's clearing agreement was not terminated for cause, when, in fact, it was terminated for cause.

175.   Plaintiff is senior citizen with a conservative or income investment strategy whose life savings in her TD Ameritrade Institutional brokerage accounts were essentially gambled away while continuously raising red flags at TD Ameritrade on; over-concentration exception reports, buying-and-holding-daily-leveraged-ETFs exception reports (i.e., exception reports that monitor for how long a daily ETF position is held), buying options on daily leveraged ETFs exception reports, excessive and repeat wash sales exception reports, margin use reports, investment-objectives-versus-concentration in daily leveraged ETF exception reports and other various exception reports that would have generated red flags under the facts alleged herein.   TD Ameritrade meekly stood up for these former UFI customers but then just acquiesced to Ms. Fernandez, in her personal capacity, openly and notoriously continuing the same wildly unsuitable investment strategy utilizing primarily daily leveraged 300% gold ETFs well into 2016 by logging in as former UFI customers now on TD Ameritrade Retail's platform.

176.   Said acts and omissions of Defendants' senior managers were committed willfully or with reckless disregard for the consequences to investors.   In addition, each of Defendants' senior managers knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.   By reason of the conduct alleged herein, Defendants, through their senior managers, knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Freezing out UFI and Ms. Fernandez

were complete repudiations of the securities being purchased and the strategy being employed while UFI and RIA/RP Fernandez were on TD Ameritrade Institutional's platform.   TD Ameritrade and TD Clearing knew Bridget Fernandez in her personal capacity was violating a number of rules in the Advisers Act which was causing TD Ameritrade and TD Clearing to also violate a number of Advisers Act provisions. *See, e.g.,* 17 CFR § 275.206(4)-2 (custody of funds or securities of clients by investment advisors); 17 CFR § 275.206(4)-7 ("Compliance procedures and practices").  But none of the Defendants informed the SEC, FINRA or the Commonwealth of Pennsylvania in 2014 (to the present) of the results of the internal investigation TD Ameritrade conducted before deciding to terminate UFI's clearing agreement by freezing out UFI and its sole RIA/RP, Ms. Fernandez.

177.    TD Ameritrade and TD Clearing operated a scheme and conspiracy in violation of Rule 10b-5 by allowing UFI, and later, Ms. Fernandez in her personal capacity, to trade securities, primarily daily leveraged ETFs, in the accounts of UFI customers, and later, former UFI customers, which continued largely unabated due to the TD Ameritrade Defendants enforcing the ban on any company in the TD Ameritrade family informing a regulator about what UFI, and later, Ms. Fernandez in her personal capacity, were doing to in the accounts of UFI customers/former UFI customers.  Fearful of what fines and corrective actions a regulator(s) would impose on one or more TD Ameritrade companies from the actions TD Ameritrade took, and did not take, regarding UFI, and later, Ms. Fernandez in her personal capacity, is what led to TD Ameritrade maliciously enforcing a wall of silence in violation of its duties under the securities laws.

178.    Based upon the policies, procedures and exception reports other BDs created and implemented to monitor daily leveraged ETF trading in the wake of FINRA's *Regulatory Notice*

*09-31* and later, when a number of large investment banks entered into AWC Letters with FINRA over their failure to supervise daily leveraged or non-traditional ETFs on or about May 1, 2012, Ms. Fernandez took insane positions and TD Ameritrade ignored or meekly responded to hundreds of red flags.  The May 1, 2012 AWC Letters FINRA executed with a number of large investment banks revealed how and when these investment banks implemented exception reports and systems for monitoring their RRs such as putting in place maximums as to the percentage of a retail brokerage accounts' value could be allocated to daily leveraged ETF investments (LPL Financial even varied these allocations depending on the customer's investment objectives).  The TD Ameritrade family of companies had similar WSPs, policies, procedures and exception reports but were not enforcing their rules or following up on hundreds of red flags regarding UFI and later Ms. Fernandez in her individual capacity in any meaningful way.

179.    When it sent out the Fernandez Removal Letters, TD Ameritrade Retail knew Ms. Fernandez would just request the new usernames and passwords created just after the Fernandez Removal Letters were sent out to continue her wildly unsuitable investment strategy of buying-and-holding daily leveraged 300% gold ETF shares in a down market for gold in the accounts of former UFI customers.  TD Ameritrade Retail stated in the Fernandez Removal Letters; "Bridget Fernandez will no longer be able to manage your account or trade on your behalf[]" but it knew this was a false statement because changing usernames and passwords had already been proven ineffective in removing Plaintiff and former UFI customers from the grip of Ms. Fernandez on one or more occasions.

SIXTH CAUSE OF ACTION
CIVIL CONSPIRACY
<u>Against All Defendants</u>

180.    Plaintiff incorporates herein paragraphs 1-179.

181.    TD Clearing, TD Ameritrade and TD Advisory are separate financial services companies licensed by FINRA and/or the SEC.  TD Clearing, TD Ameritrade and TD Advisory each have regulatory obligations separate and apart from any duty they may owe each other.  TD Ameritrade Institutional and TD Ameritrade Retail are separate divisions of TD Ameritrade operating independently of each other.  A conspiracy was formed once TD Clearing and/or TD Ameritrade decided no one working for a company in the TD Ameritrade family of companies was allowed to contact a regulator about the securities trading of UFI, RIA/RP Fernandez and/or Ms. Fernandez in her personal capacity,.  This conspiracy has been continually enforced over a number of years- it continues today.  TD Clearing and TD Ameritrade informed TD Advisory about UFI and Ms. Fernandez and required it to join the conspiracy and deceive former UFI customers- it obliged.

182.    Numerous registered employees of TD Clearing, TD Ameritrade and TD Advisory, including senior management, conspired, combined and/or agreed with intent to not comply with the securities laws nor allow a regulator to enforce the securities laws with respect to any of the Defendants.  Numerous registered employees of TD Clearing, TD Ameritrade and TD Advisory conspired, combined and/or agreed with intent to not comply with their respective fiduciary duties, contractual duties and other duties to UFI customers and former UFI customers.

183.    The proof of malice in the conspiracy described herein is that TD Clearing, TD Ameritrade and TD Advisory each knew of the substantial loss of money Plaintiff would suffer by allowing UFI, RIA/RP Fernandez and later Ms. Fernandez in her personal capacity to engage in a wildly unsuitable investment strategy involving over-concentrating her retirement savings in wildly unsuitable daily leveraged ETFs.  This conspiracy allowed Mrs. Antczak to lose hundreds

of thousands of dollars with TD Ameritrade's full knowledge of that consequence and assistance by enforcing its code of silence.

184.     This conspiracy has denied regulators, to date, the opportunity to seek restitution for Mrs. Antczak from any of the Defendants named herein despite TD Ameritrade's full knowledge that FINRA was routinely requiring BDs to provide restitution for failing to supervise the recommendation and purchase of daily leveraged ETFs.   Indeed, TD Ameritrade knew from AWC Letters that FINRA had even required restitution be made to customers of introducing BDs who lost *just a single dollar* due to the failure of the BD to properly supervise the recommendation and purchase of daily leveraged ETFs in the brokerage accounts of their customers.   TD Ameritrade maliciously decided to sacrifice Mrs. Antczak's retirement savings to spare the TD Ameritrade family of companies the cost of reform, FINRA fines, restitution to Mrs. Antczak and hundreds or thousands of other customers and the bad publicity and loss of customers that comes with the disclosure of the facts described herein.   As described herein, each member of the TD Ameritrade family of companies committed one or more overt acts in support of the illicit agreement that no regulators would be contacted at any point in time regarding the facts herein.

## CLASS DEFINITIONS AND ALLEGATIONS

185.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure for the purpose of asserting the claims alleged in this Complaint on a common basis.   Plaintiff brings this action on behalf of herself and all members of the following classes comprised of:

## CLASS CLAIMS

186.     Plaintiff incorporates herein paragraphs 1-185.

187.    The first Class definition includes:

All customers who suffered damages because their IA and/or introducing BD that operated on the TD Ameritrade Institutional platform exercised discretion in their brokerage accounts to over-concentrate by fifty percent (50%) or more on a cost basis the account in daily leveraged ETFs.

The first Class is referred herein to as the "Pre-Freeze Class."

188.    The second Class definition includes:

All former customers of an IA and/or introducing BD that operated on the TD Ameritrade Institutional platform whose brokerage accounts were managed on a discretionary basis and suffered losses after TD Ameritrade Institutional and/or TD Clearing froze their IA and/or introducing BD out from trading in their accounts, migrated their account over to the TD Ameritrade Retail platform and then learned the RIA/RR who had been their licensed investment professional was using their log-in information to continue serving as their "advisor" managing their TD Ameritrade Retail brokerage account on a discretionary basis until the date TD Ameritrade or TD Clearing informed a regulator about same.

The second Class is referred herein to as the "Post-Freeze Class."

189.    The third Class definition is:

All customers of an IA and/or introducing BD that operated on the TD Ameritrade Institutional platform who had a AUM management fee deducted from their brokerage account by TD Ameritrade Institutional and/or TD Clearing for a current or upcoming calendar quarter which TD Ameritrade and/or TD Clearing did not refund the unearned portion of, *pro rata*, upon TD Ameritrade and/or TD Clearing terminating the IA's and/or introducing BD's clearing agreement prior to the end of the calendar quarter the management fee was collected for.

The third Class is referred herein to as the "*Pro Rata* AUM Fee Class."

190.    *Numerosity*. Rule 23(a)(1).  The members of the various Classes are so numerous that their individual joinder is impracticable.  TD Ameritrade Institutional has thousands of small IAs and introducing BDs as clients each year and it and/or TD Clearing routinely terminate some of these relationships every year "for cause" without putting same in writing.  One unmistakable sign that the termination of a clearing agreement was "for cause" is when the termination includes freezing out the rogue IA/introducing BD from trading in the accounts of its customers

on TD Ameritrade's Institutional platform.  Each rogue IA and/or introducing BD terminated "for cause" without putting same in writing by TD Ameritrade Institutional and/or TD Clearing had dozens or even hundreds of affected customers.  According to PriceMetrix.com, the average number of customers per RIA was 156 in 2013 and 150 in 2014. *See* PriceMetrix.com, *2014 Exceptionally Strong Year for Retail Wealth Management Industry; Advisor Assets Hit Record High, Revenue Up Sharply, Client Retention Improve*, March 30, 2015.

191.   *Existence of Common Questions of Law and Fact.* This action involves common questions of law and fact, which include, but are not limited to, the following:

    a.   whether the letters written by TD Ameritrade to the customers of IAs and/or introducing BDs that had been frozen out of their customers' brokerage accounts on TD Ameritrade Institutional's platform contained false or misleading statements;

    b.   whether the letters written by TD Ameritrade to the former customers of IAs and/or introducing BDs frozen out of their customers' brokerage accounts on TD Ameritrade Institutional's platform who migrated to TD Ameritrade Retail's platform contained false or misleading statements about TD Ameritrade and/or TD Clearing freezing out their now unlicensed "advisor," such as, for example, the Fernandez Removal Letters referring to Bridget Fernandez as an "advisor" when TD Ameritrade knew she was no longer licensed;

    c.   determining exactly when the duty arose as to each of the TD Ameritrade Defendants to report a rogue introducing BD or IA frozen out of TD Ameritrade Institutional brokerage accounts to a regulator;

    d.   establishing when the TD Ameritrade Defendants' duty to inform a regulator arose about a rogue RIA/RP like Ms. Fernandez in her personal capacity after they learned she had circumvented multiple freeze outs put in place by TD Ameritrade Retail;

    e.   determining why the TD Ameritrade Defendants did not inform the recipients of the April 17th Termination Letters, the Fernandez Removal Letters and all similar letters written to Class members that they needed to contact their state securities regulator, the SEC, FINRA or an attorney;

    f.   determining why the TD Ameritrade Defendants misrepresented material facts about the Defendants' knowledge about what was taking place in TD Ameritrade brokerage accounts to the recipients of the April 17th Termination Letters, the Fernandez Removal Letters and all similar letters written to Class members;

g.  determining what policies and procedures each of the TD Ameritrade Defendants had in place regarding limiting the over-concentration of daily leveraged ETFs and monitoring the trading of daily leveraged ETFs in brokerage accounts and whether these policies and procedures were carried out;

h.  examining how the policies and procedures in the TD Ameritrade Defendants' respective WSPs changed over time regarding the trading of daily leveraged ETFs, especially in response to, among other events, FINRA's issuance of *Regulatory Notice 09-31* and the May 1, 2012 publication of AWC Letters with several of the largest investment banks for failing to supervise the sale of daily leveraged ETFs;

i.  whether TD Ameritrade Institutional and/or TD Clearing routinely terminate IAs and/or introducing BDs "for cause" without stating such in writing by freezing them out of their customers' accounts and why this practice is condoned;

j.  determining what exception reports TD Ameritrade and TD Clearing have been using to monitor the trading and concentration of daily leveraged ETFs in TD Ameritrade brokerage accounts, what was being done to follow up on the contents of those exception reports, and how many red flags were ignored as to each rogue introducing BD/IA;

k.  determining whether the TD Ameritrade Defendants had a duty to inquire, investigate or create a paper trail justifying suitability when, for example, the IRA of a retired senior citizen had a 50% or more concentration on a cost basis in one or two daily leveraged 300% ETFs and TD Ameritrade knew that the investment strategy for the account was being carried out by an RIA who lost her license;

l.  whether letters and emails written by UFI and/or Ms. Fernandez in her personal capacity contained false or misleading statements;

m.  whether state or federal securities laws were violated by Defendants' acts as alleged herein;

n.  what happened to, and which Defendant gained possession of, the $1,009 of cash removed from Mrs. Antczak's account on April 15, 2014 by TD Ameritrade or TD Clearing as an AUM fee and why $830 of that amount has not been returned to Plaintiff and all other similarly situated customers;

o.  whether the TD Ameritrade family of companies enforces and has enforced a conspiracy which prohibited contacting a regulator in instances where TD Ameritrade Institutional and/or TD Clearing have terminated an IA and/or introducing BD "for cause" without stating such in writing;

p.  whether Plaintiff and the other members of the various Classes are entitled to damages; and

    q.  whether Plaintiff and the members of the various Classes are entitled to restitution, other equitable relief, and/or other relief as may be proper.

192.   *Typicality. Rule 23(a)(3).* The members of each of the 3 Classes have been subjected to and affected by the same conduct by the TD Ameritrade Defendants and a rogue introducing BD/IA like UFI. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff and members of each Class. All Defendants failed to act upon due consideration of their fiduciary duty to the members of each Class who were subjected to the same wrongful conduct. Plaintiff's claims are typical of each member of the various Classes' claims and do not conflict with the interests of any other members of the Classes. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions violated state laws and federal securities laws and included conspiring to enforce a code of silence whereby no employee working for a company in the TD Ameritrade family was allowed to contact a regulator because TD Ameritrade did not want to suffer the bad publicity and nor pay the fines to regulators and restitution to customers it would have to pony up if the truth got out about how it handles rogue introducing BDs/IAs like UFI and the trading of daily leveraged ETFs.

193.   *Adequacy. Rule 23(a)(4).* Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has retained counsel experienced in complex securities fraud and consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interest adverse or antagonistic to those of the Classes.

194.   *Predominance and Superiority of Class Action. Rule 23(b)(3).* Questions of law or fact common to the Classes predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

a. Determining how long TD Ameritrade and TD Clearing permitted UFI and other rogue introducing BDs/IAs to openly and notoriously engage in a wildly unsuitable investment strategy involving wildly unsuitable daily leveraged ETFs before freezing them out of their respective customers' accounts;

b. Whether TD Ameritrade and/or TD Clearing ignored their WSPs and exception reports regarding the trading and concentration of daily leveraged ETFs in TD Ameritrade brokerage accounts;

c. Whether the TD Ameritrade family of companies sought to deceive regulators by terminating rogue BDs/IAs officially "without cause" when, in fact, these rogue introducing BDs/IAs were terminated "for cause;"

d. Whether the TD Ameritrade family of companies enforced a conspiracy of silence in order to avoid regulatory scrutiny of the facts described herein;

e. Absent a class action, members of the *Pro Rata* AUM Fee Class as a practical matter will be unable to obtain redress because, *inter alia*, the amounts due back to each Class member are too small to pursue litigation individually;

f. Absent a class action, members of the Pre-Freeze Out Class as a practical matter will be unable to obtain redress because, *inter alia*, of the complexity of the TD Ameritrade Defendants actions' and other issues described herein;

g. Absent a class action, members of the Post-Freeze Out Class as a practical matter will be unable to obtain redress because, *inter alia*, the TD Ameritrade Defendants have taken a number of actions described herein to keep their customers, the public and regulators from knowing it condones unlicensed former RIA/RPs engaging in wildly unsuitable investment strategies using wildly unsuitable daily leveraged ETFs by using their former customers' log-in information on the TD Ameritrade Retail platform after having been frozen out of those same customers' brokerage accounts on the TD Ameritrade Institutional platform;

h. Absent a class action, members of all 3 Classes as a practical matter will be unable to obtain redress because each cause of action has multiple Defendants who will have varying degrees of liability and involves other complex matters more suitable for determination on a class-wide basis than by litigating individual actions including the conspiracy that existed between the TD Ameritrade Defendants.

i. Defendants' violations of their legal obligations will continue without remedy, additional customers will be harmed, and the TD Ameritrade Defendants will continue to freeze out introducing BDs/IAs from their accounts without labeling the termination in writing as "for cause;"

h. It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

i. When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of each of the Classes;

j. A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense;

k. A class action regarding the issues in this case does not create any problems of manageability;

l. Defendants have acted on grounds generally applicable to the members of each of the Classes, making class-wide monetary relief appropriate; and

m. By pursuing a uniform course of conduct upon terminating rogue introducing BDs/IAs, the TD Ameritrade Defendants failed to carry out their written policies and procedures to the detriment of all members of each Class.

195.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members involved a number of the companies within the TD Ameritrade family of companies, the expense and burden of individual litigation make it impossible for members of each Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and each member of three Classes, requests entry of a judgment for damages in favor of Plaintiff and each of the three Classes and as follows:

A) Declaring this Action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Classes with Plaintiff as Class Representative for each Class and Plaintiff's counsel as Class Counsel;

B) Directing the TD Ameritrade Defendants to take all necessary actions to reform and improve their internal policies and procedures to protect from reoccurrences of the damaging events described herein;

C) Awarding Plaintiff the costs and disbursements of this Action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

D) Granting Plaintiff such other and further relief as the Court deems proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  November 3, 2017

                                    TASWANSEN LLC

                                    /s/ *Theodor A. Swansen*
                                    Theodor A. Swansen
                                    PA bar ID No. 84712
                                    334 Queen St., RH 1
                                    Philadelphia, PA 19147
                                    (215) 260-8469
                                    swansenllc@gmail.com